NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

DANIEL LOCUS,                    :    Civ. Action No. 18-11527 (RMB)
                                 :
            Petitioner           :
                                 :
      v.                         :           **OPINION**
                                 :
STEVEN JOHNSON, Administrator,   :
and ATTORNEY GENERAL             :
OF THE STATE OF NEW JERSEY,      :
                                 :
            Respondents          :
                                 :

BUMB, UNITED STATES DISTRICT JUDGE

     This matter comes before the Court upon Petitioner Daniel Locus' ("Petitioner") Petition for a Writ of Habeas Corpus under 28 U.S.C. § 2254, challenging his state court conviction for murder (Pet., Dkt. No. 1), Respondents' answer opposing habeas relief (Answer, Dkt. No. 8), and Petitioner's traverse (Traverse, Dkt. No. 9.) For the reasons set forth below, the Court denies the petition for writ of habeas corpus.

I.   PROCEDURAL HISTORY

     On February 25, 2009, a Camden County grand jury returned an Indictment charging Petitioner with the first-degree murder of Anthony Ball, in violation of N.J.S.A. 2C:11-3a(1), (2) (Count One); second-degree possession of a weapon for an unlawful purpose,

in violation of N.J.S.A. 2C:39-4a (Count Two); second-degree unlawful possession of a weapon, in violation of N.J.S.A. 2C:39-5b (Count Three); third-degree endangering an injured victim, in violation of N.J.S.A. 2C:12-1.2 (Count Four); and second-degree certain persons not to have weapons, in violation of N.J.S.A. 2C:39-7b (Count Five). (Ex. Ra1, Dkt. No. 8-3). The New Jersey Superior Court, Camden County, conducted a <u>Wade</u> hearing[1] on May 7, 2010, and held that none of the witness identifications by the State's six witnesses ran afoul of <u>Wade</u>. (Ex. Rta1 at 194-201, Dkt. No. 8-31 at 197-204; Ex. Rta2 at 4, Dkt. No. 8-32.)[2]

On June 16, 2010, a jury found Petitioner guilty of the first four counts of the Indictment, and count five (certain persons) was dismissed on the State's motion after the jury began deliberations. (Ex. Rta12 179-80, Dkt. No. 8-42; Ex. Rta13 at 5-8, Dkt. No. 8-43; Ex. Ra2, Dkt. No. 8-4.) The trial court denied Petitioner's motion for a new trial on August 13, 2010. (Ex. Rta14 at 24-27, Dkt. No. 8-44 at 13-14.) On the same day, the trial court sentenced Petitioner to an aggregate fifty-nine year term of imprisonment, fifty-five years to be served under NERA. (Ex. Rta14 at 40-41; Dkt. No. 8-44 at 21; Ex. Ra2, Dkt. No. 8-4.) The Appellate

---

[1] <u>United States v. Wade</u>, 388 U.S. 218 (1967).

[2] Page citations are provided for the original exhibit, and where different page numbers appear on the docket, citations to the page numbers assigned by the Court's electronic case management filing system, CM/ECF, are also provided.

Division affirmed Petitioner's conviction and sentence in an unpublished written opinion on October 17, 2013. (Ex. Ra9, Dkt. No. 8-11.) On May 14, 2014, the New Jersey Supreme Court denied Petitioner's petition for certification. (Ex. Ra13, Dkt. No. 8-15.)

Petitioner filed a petition for post-conviction relief ("PCR") on August 14, 2014. (Ex. Ra14, Dkt. No. 8-16.) On July 31, 2015, the Honorable Kathleen M. Delaney, J.S.C. issued a comprehensive decision denying Petitioner's PCR petition without an evidentiary hearing. (Ex. Rta16 at 20-43, Dkt. No. 8-46 at 11-22.) On January 2, 2018, the Appellate Division affirmed the denial of Petitioner's petition for post-conviction relief. (Ex. Ra22, Dkt. No. 8-26.) On June 1, 2018, the New Jersey Supreme Court denied Petitioner's petition for certification. (Ex. Ra26, Dkt. No. 8-30.) This habeas petition followed.

II. FACTS DETERMINED BY APELLATE DIVISION ON DIRECT APPEAL

28 U.S.C. § 2254(e)(1) provides that

> In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

On direct appeal, the Appellate Division made the following findings of fact.

At the trial, the State presented evidence which established that on June 9, 2008, at around 10:30 p.m., Anthony Ball was shot in the head at close range near an abandoned house on Pine Street in Camden. The gun used was a .380 caliber Llama brand pistol, and a .380 casing was found on the first step of the house. The murder weapon was never found. Ball was taken to a hospital and placed on a respirator. He died two days later…. Madonna Caraballo was Ball's friend…. In June 2008, Caraballo was homeless. In the previous months, Caraballo had been purchasing crack cocaine from defendant, whom she knew as "Pooh" or "Pooh Bear." Defendant operated out of a "drug house" on Pine Street in Camden, which was known as "Lawrence's House."

Sometime during the day on June 9, 2008, Caraballo and Ball purchased cocaine from defendant. That night, Caraballo and Ball wanted to purchase more cocaine but they did not have any money. Ball suggested that they steal some drugs from defendant's stash, which he kept in an alley adjacent to an abandoned house on Pine Street, across the street from Lawrence's House. They planned to have Caraballo meet defendant behind the abandoned house and keep him occupied there by offering to engage in a sex act, while Ball took the drugs. However, when defendant met Caraballo behind the house, he told her to "get lost" and left.

Caraballo testified that she came out from behind the house and started to walk down the alley. She saw Ball crouched near the drug stash at the other end of the alley. Ball got up and started to walk back to Pine Street. As Caraballo reached the sidewalk on Pine Street, she saw a flash and heard a shot. She did not realize immediately that Ball had been shot. Caraballo left with her friend, Walter Boyd (Boyd), who told Caraballo he could not believe "Pooh" had done "that."

Boyd also had purchased crack from defendant
from time to time. He knew Ball. Boyd
testified that on the evening of June 9, 2008,
he walked near the abandoned house with
Caraballo, but they separated while Boyd
approached defendant, who was standing in
front of Lawrence's House. Boyd purchased
drugs from defendant and, as he was walking
away, he heard a sound like a gunshot. Boyd
looked back. He saw Ball fall near the alley
and observed defendant running away. Boyd said
defendant was the only person near Ball on
that side of the street at the time and
defendant was the only person he saw running
away from Ball.

Patricia Myers knew defendant as well. She had
been purchasing drugs from him regularly
during the previous two years. Myers also knew
Ball. They had smoked crack cocaine together.
On the evening of June 9, 2008, Myers … saw
Ball come down the street. He went over to the
abandoned house and into the alleyway. Myers
observed Ball reach down into the weeds where
the drugs were stashed. Myers said that
defendant was across the street by Lawrence's
House. He walked across the street toward Ball
and, according to Myers, said he was going "to
blow" Ball's "fucking brains out." According
to Myers, Ball walked back to the house by the
alley. Defendant approached Ball and shot him
in the head. Myers said she saw the flash of
the gun. She also saw Ball fall and defendant
run off. Myers ran away. . . .

Angela Bumpers had known defendant for about
fifteen years. She also knew Ball. In June
2008, Bumpers was using heroin and crack
cocaine and had been purchasing drugs from
defendant in the previous months. On the
evening of June 9, 2008, Bumpers was sitting
out near a gas station at the intersection of
Pine Street and Broadway, facing Pine Street.
She saw Ball walk past her and head toward
Lawrence's House. Ball went across to the
abandoned house. Bumpers heard a gunshot. She
saw Ball grab his head and fall. She stated

that defendant was the only person around Ball, and she saw him put a gun in his pocket and run away.

Investigator James Bruno responded to the scene of the shooting. Bruno initially learned that someone named "Pooh" or "Pooh Bear" was the last person seen with Ball. On further investigation, Bruno learned that James Williams (Williams) went by the name "Pooh" and had been arrested on unrelated charges on June 10, 2008, three hours after the shooting. Bruno interviewed Williams, who told him that, while he had seen Ball on the night of the shooting, he was not in the area when the shooting occurred.

On June 11, 2008, the Camden police executed a search warrant at Lawrence's House. The police obtained information from defendant, who was outside the house at the time. On June 12, 2008, Bruno learned that Myers had been an eyewitness to the shooting. Myers told Bruno she was present at the time and the man responsible was her drug dealer, from whom she had purchased drugs on a regular basis over two years, including the night of the murder.

Bruno showed Myers a photograph of Williams, but she said he was not the shooter. Bruno thereafter asked the police intelligence unit to compile a book of photographs of persons who had been arrested in the area of Lawrence's House, or who had some connection to the area. The book contained twenty-two photos, including photos of Williams and defendant.

In early July of 2008, Bruno was notified that Caraballo wanted to speak to him about the homicide. At the time, Caraballo was incarcerated in the county jail. Caraballo told Bruno that on the evening of June 9, 2008, she was behind the abandoned house where Ball was shot. Caraballo said Boyd observed the shooting. Later, Bruno spoke with Boyd, who

told him that Bumpers, who was also in the county jail, had also witnessed the shooting.

On July 2, 2008, Caraballo, Boyd, and Bumpers were separately interviewed and shown the book of twenty-two photos. At the time, neither Williams nor defendant were suspects. Boyd identified defendant as the person from whom he had purchased drugs shortly before Ball was shot. Boyd said that after he purchased the drugs, he heard a gunshot. He turned and saw defendant running from the place where Ball was shot and fell.

Caraballo identified defendant as someone she knew as "Pooh Bear" and from whom she regularly purchased drugs. Bumpers told the investigators that she knew defendant and saw him with a gun in his hand on the night of the homicide. Bumpers said she saw a flash when the gun went off, and defendant ran from Ball as he fell.

The following day, Bruno met with Myers to determine if defendant was the person whom she saw shoot Ball. Bruno showed Myers a picture of defendant, but did not tell Myers who he was or whether any other witnesses had identified him. Myers identified defendant as the shooter.

Defendant was arrested on July 7, 2008. While defendant was incarcerated in the county jail, he spoke about the charges with Ernest Braxton, who also was incarcerated there. Defendant asked whether Braxton could help him secure an insanity plea. Defendant and Braxton had both worked for the same person selling drugs at "Lawrence's House," and they had known each other for two or three years. Braxton also knew Ball. Braxton testified that defendant told him "they locked him up for" Ball's murder. Braxton said he had heard Ball had been shot in the back of the head, but defendant indicated with hand gestures that Ball was shot in his left temple. Braxton

subsequently reported this conversation to Bruno.

Braxton further testified that, a few days before the shooting, defendant asked him for bullets for his gun. Braxton asked defendant what kind of gun, and defendant pulled out his gun and said ".380." Braxton was familiar with guns and recognized the gun as a Llama, and said "You need [a] .380 Llama. [You] [d]on't need .380s, you need [a] .380 Llama."

Gerald Feigin, M.D., the Medical Examiner of Camden, Gloucester, and Salem Counties, testified that … the death was a homicide, caused by a gunshot wound inflicted from about six inches away from the left side corner of Ball's left eye….

Detective Sergeant James Ryan, an expert in firearms, examined the bullet taken from Ball's skull and the shell found at the crime scene. Ryan said the shell was a .380 caliber casing and the bullet was consistent with a .380 caliber bullet. He also said the bullet had been fired from a gun manufactured by Llama.

Defendant did not testify at trial and presented no witnesses on his own behalf. After the jury began its deliberations, the State agreed to dismiss count five, which charged defendant with certain persons not to have weapons. The jury found defendant guilty on the remaining four counts. Defendant subsequently filed a motion for a new trial. On August 13, 2010, the judge denied the motion and sentenced defendant.

(Ex. Ra9 at 2-10, Dkt. No. 8-11.)

III.    DISCUSSION

    A.    <u>Standard of Review</u>

Prior to bringing a federal habeas petition under 28 U.S.C. § 2254(b)(1)(A), a state prisoner must exhaust his state remedies. Nevertheless, "[a]n application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State." § 2254(b)(2). If a state prisoner's constitutional claim has been barred in the state courts on procedural grounds, a procedural default occurs and a habeas court cannot review the claim absent a showing of cause and prejudice or actual innocence. Coleman v. Thompson, 501 U.S. 722, 729, 750 (1991).

If a constitutional claim has been exhausted,

> [a]n application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
>
>> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>>
>> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

When a state court summarily rejects all or some federal claims without discussion, habeas courts must presume the

claim(s) was adjudicated on the merits. <u>Bennett v. Superintendent</u> <u>Graterford SCI</u>, 886 F.3d 268, 282 (3d Cir. 2018) (citing <u>Johnson</u> <u>v. Williams</u>, 568 U.S. 289, 302 (2013)). The presumption is rebuttable. <u>Bennett</u>, 886 F.3d at 281-83. The Supreme Court provided the following guidance.

> [H]ow [is] a federal habeas court is to find the state court's reasons when the relevant state-court decision on the merits, say, a state supreme court decision, does not come accompanied with those reasons. For instance, the decision may consist of a one-word order, such as "affirmed" or "denied." What then is the federal habeas court to do? We hold that the federal court should "look through" the unexplained decision to the last related state-court decision that does provide a relevant rationale. It should then presume that the unexplained decision adopted the same reasoning. But the State may rebut the presumption by showing that the unexplained affirmance relied or most likely did rely on different grounds than the lower state court's decision, such as alternative grounds for affirmance that were briefed or argued to the state supreme court or obvious in the record it reviewed.

<u>Wilson v. Sellers</u>, 138 S. Ct. 1188, 1192 (2018). "When the evidence leads very clearly to the conclusion that a federal claim was inadvertently overlooked in state court, § 2254(d) entitles the prisoner to an unencumbered opportunity to make his case before a federal judge." <u>Johnson</u>, 568 U.S. at 303.

The Third Circuit directed habeas courts to follow a two-step analysis under § 2254(d)(1). <u>See</u> <u>Rosen v. Superintendent</u> <u>Mahanoy SCI</u>, 972 F.3d 245, 253 (3d Cir. 2020) (citing <u>Matteo v.</u>

Superintendent, SCI Albion, 171 F.3d 877, 888 (3d Cir. 1999) (*en banc*), cert. denied 528 U.S. 824 (1999)). First, courts should "determine what the clearly established Supreme Court decisional law was at the time Petitioner's conviction became final" and "identify whether the Supreme Court has articulated a rule specific enough to trigger 'contrary to' review." Id. at 253 (quoting Fischetti v. Johnson, 384 F.3d 140, 148 (3d Cir. 2004)). "The 'clearly established Federal law' provision requires Supreme Court decisions to be viewed through a 'sharply focused lens.'" Id. Clearly established law "refers to the holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." Williams v. Taylor, 529 U.S. 362, 412 (2000). A decision is "contrary to" a Supreme Court holding within 28 U.S.C. § 2254(d)(1), only if the state court applies a rule that "contradicts the governing law set forth in [the Supreme Court's] cases" or if it "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a [different result.]" Williams, 529 U.S. at 405-06.

Second, if Supreme Court precedent is not specific enough to trigger contrary review, habeas courts should "evaluate whether the state court unreasonably applied the relevant body of precedent." Rosen, 972 F.3d at 253 (quoting Matteo, 171 F.3d at 888)). Under § 2254(d)(1), "an unreasonable application of

federal law is different from an incorrect application of federal law." Harrington v. Richter, 562 U.S. 86, 101 (2011) (quoting Williams, 529 U.S. at 410). For relief under this provision, the state court's decision "evaluated objectively" must have "resulted in an outcome that cannot reasonably be justified under existing Supreme Court precedent." Rosen, 972 F.3d at 252 (quoting Matteo, 171 F.3d at 890)). A habeas court must frame the "relevant question as whether a fairminded jurist could reach a different conclusion." Shinn v. Kayer, 141 S. Ct. 517, 524 (2020) or, in other words, whether "every fairminded jurist would disagree" with the state court. Mays v. Hines, 141 S. Ct. 1145, 1149 (2021).

A petitioner who claims that the state court's adjudication of his claim was based on an unreasonable factual determination under § 2254(d)(2), faces a similarly heavy burden of proof because "a determination of a factual issue made by a State court shall be presumed to be correct." 28 U.S.C. § 2254(e)(1); see also Miller-El v. Cockerell, 537 U.S. 322, 340 (2003). "The petitioner must show that the state court verdict was based on an unreasonable determination of the evidence and that a reasonable factfinder could not have reached the same conclusion." Rosen, 972 F.3d at 252 (3d Cir. 2020) (citing Campbell v. Vaughn, 209 F.3d 280, 291 (3d Cir. 2000)).

"Although state prisoners may sometimes submit new evidence in federal court," the habeas statute, "is designed to strongly discourage them from doing so." Cullen v. Pinholster, 563 U.S. 170, 186 (2011). "Provisions like §§ 2254(d)(1) and (e)(2) ensure that '[f]ederal courts sitting in habeas are not an alternative forum for trying facts and issues which a prisoner made insufficient effort to pursue in state proceedings.'" Id. (quoting Williams v. Taylor ("Michael Williams"), 529 U.S. at 437 (additional citations omitted)). Review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits. Pinholster, 563 U.S. 170, 180-81 (2011).

The habeas statute also permits an evidentiary hearing under the following circumstances,

> (2) If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that—
>
> > (A) the claim relies on—
> >
> > > (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
> > >
> > > (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and

> (B) the facts underlying the claim would
> be sufficient to establish by clear and
> convincing evidence that but for
> constitutional error, no reasonable
> factfinder would have found the applicant
> guilty of the underlying offense.

28 U.S.C. § 2254(e). The Supreme Court explained,

> Section 2254(e)(2) continues to have force
> where § 2254(d)(1) does not bar federal habeas
> relief. For example, not all federal habeas
> claims by state prisoners fall within the scope
> of § 2254(d), which applies only to claims
> "adjudicated on the merits in State court
> proceedings." At a minimum, therefore, §
> 2254(e)(2) still restricts the discretion of
> federal habeas courts to consider new evidence
> when deciding claims that were not adjudicated
> on the merits in state court. *See*, *e.g.*,
> *Michael Williams*, 529 U.S., at 427–429, 120
> S.Ct. 1479.

Pinholster, 563 U.S. at 185–86.

B.  Ground One

In his first ground for relief, Petitioner asserts that the pretrial photographic identification and in court identifications of him by Patricia Myers, Walter Boyd, Angela Bumpers and Madonna Carabello were impermissibly suggestive. (Pet. at 5, 15-16, Dkt. No. 1.) Petitioner explains that the pretrial photographic identification was conducted by Investigator James Bruno, who investigated the murder. The photo array shown to Boyd, Bumpers and Carabello contained a number of people who did not look alike, and Petitioner's photo depicted the only person wearing cornrows, consistent with the description of the suspect by witnesses. As to

Myers, Petitioner argues that the entire trial was tainted with unfairness by showing her a single photo of him for identification.

Respondents oppose relief on ground one of the petition, arguing that the Appellate Division properly rejected Petitioner's claim. (Answer at 49-66, Dkt. No. 8.) Respondents maintain that the witnesses all knew Petitioner as their drug dealer and would recognize him if they saw him. The police showed a group of photographs of those known to frequent the area of the murder in hopes that the witnesses could identify someone. The photo identifications by Carabello, Boyd and Bumpers were not impermissibly suggestive because the police did not have a suspect at the time of the identifications and, therefore, could not suggest anyone. Investigator Bruno showed a single photo to Myers, knowing she was well acquainted with her drug dealer prior to the murder.

In his traverse, Petitioner asserts these witnesses did not know him, they knew someone whom they called "Pooh Bear," and his nickname was "Philly." (Traverse at 5-17, Dkt. No. 9 at 10-22.) Thus, he seeks an evidentiary hearing on whether the four eyewitnesses actually knew him prior to the shooting. Petitioner also seeks an evidentiary hearing on factual disputes concerning whether the identifications were impermissibly suggestive. (Id. at 23, Dkt. No. 9 at 28.)

1. *State court determination*

As a preliminary matter, applicable to each of the grounds for relief in the petition, the New Jersey Supreme Court denied review of the Appellate Division's opinion on direct appeal and PCR appeal. Therefore, this Court "look[s] through" to the Appellate Division's reasons for rejecting Petitioner's federal claims. See Wilson, 138 S. Ct. at 1192 (describing "look-through" procedure). The Appellate Division, on direct appeal, decided this claim as follows:

> [T]he test for admission of identification testimony to be applied in this case is the test established in Manson v. Brathwaite, 432 U.S. 98, 97 S. Ct. 2243, 53 L. Ed. 2d 140 (1977), and State v. Madison, 109 N.J. 223 (1988). Henderson, supra, 208 N.J. at 300-02. The Manson/Madison test "requires courts to determine first if police identification procedures were impermissibly suggestive; if so, courts then weigh five reliability factors to decide if the identification evidence is nonetheless admissible." Id. at 224 (citing Manson, supra, 432 U.S. at 114, 97 S. Ct. at 2253, 53 L. Ed. 2d at 154; Madison, supra, 109 N.J. at 232-33).

> In this case, the judge conducted a Wade hearing and determined that the identifications were admissible. The judge found that there was nothing suggestive about the procedures employed by the police in obtaining those identifications. As we stated previously, the investigators showed the witnesses the book of twenty-two photographs, but they did not suggest that defendant was the perpetrator when doing so.

> Indeed, the record shows that, at the time the witnesses were shown the photos, the

investigators did not have a target. Furthermore, when the investigators showed the witnesses the photos, they did not give the witnesses any suggestive instructions. The investigators merely asked the witnesses whether they recognized anyone who was at the scene of the shooting and whether anyone looked familiar.

In addition, the judge found that the identifications were independently reliable. Myers, Boyd, Bumpers and Caraballo all knew defendant personally and their identifications were based on that knowledge. The witnesses stated that they were certain of their identifications. Moreover, the identifications occurred within a few weeks after the shooting, three of the witnesses had purchased drugs from defendant shortly before that incident, and all four witnesses observed defendant around the time Ball was shot.

Although defendant takes issue with the fact that Myers identified defendant after being shown a single photo, this was not a photographic "show-up." As Bruno explained, Myers was shown the photo to confirm that defendant was a person she had seen shoot Ball. Even if this procedure was impermissibly suggestive, Myers' testimony established that her identification was sufficiently reliable for its admission at trial.

(Ex. Ra9 at 12-14, Dkt. No. 8-11.)

   2.   *Analysis*

   The Appellate Division applied clearly established federal law, using the <u>Manson</u> test, to evaluate the admission of identification testimony. Petitioner has not cited a case on point that requires determination of whether the state court decision was "contrary to" clearly established law. Therefore, the Court

turns to whether the Appellate Division reasonably applied clearly

established federal law. The Third Circuit described the <u>Manson</u>

test in <u>Dennis v. Sec'y, Pennsylvania Dep't of Corr.</u>, 834 F.3d

263, 335 (3d Cir. 2016), as follows.

> Under the *Manson* test, a court must first
> assess whether the eyewitness identification
> procedure at issue was, under the "totality of
> the circumstances," unnecessarily suggestive.
> If the identification procedure was not
> unnecessarily suggestive, the inquiry ends.
> However, if it was unduly suggestive, a court
> must consider five factors to determine
> whether the resulting identification is
> nonetheless reliable. Those factors, drawn
> from the Supreme Court's prior decision in
> *Neil v. Biggers*, are: (1) "the opportunity of
> the witness to view the criminal at the time
> of the crime," (2) "the witness' degree of
> attention," (3) "the accuracy of the witness'
> prior description of the criminal," (4) "the
> level of certainty demonstrated by the witness
> at the confrontation," and (5) "the length of
> time between the crime and the confrontation."
> These factors are weighed against "the
> corrupting effect of the suggestive
> identification itself." *Manson* emphasizes
> that "reliability is the linchpin in
> determining the admissibility of
> identification testimony."

The Appellate Division held that the out-of-court

identifications by Boyd, Bumpers and Carabello were not

impermissibly suggestive because (1) when police showed the

eyewitnesses a book of 22 photographs, the police did not have a

target, so they had no reason to suggest a particular photograph;

and (2) police did not give any suggestive instructions, they

simply asked the eyewitnesses whether they recognized anyone from

the scene of the shooting and whether anyone looked familiar. Not every fairminded jurist would disagree with this conclusion, as is required for habeas relief. Although Petitioner was the only person in the photo array who wore cornrows, the Appellate Division found the identifications were reliable because all of the witnesses knew Petitioner personally and made their identifications based on that knowledge, and they had all seen Petitioner at the crime scene within a few weeks of the identifications. All fairminded jurists would not disagree with the well-reasoned decision by the Appellate Division. See e.g., U.S. v. Lawrence, 349 F.3d 109, 116 (3d Cir. 2003) (where defendant's photo was the only one depicting a person not wearing a shirt and wearing jewelry, totality of the circumstances established reliable identifications.)

Petitioner seeks an evidentiary hearing on the reliability of the witness identifications because they had given statements about the presence of a person called "Pooh Bear" and his nickname was "Philly." The state courts, however, denied this claim on the merits. Therefore, according to the Supreme Court, habeas review is limited to the state court records and Petitioner's request for an evidentiary hearing is denied. Pinholster, 563 U.S. at 180-81 (2011).

The remaining eyewitness, Myers, was shown a single photo to confirm that Petitioner was the person whom she saw shoot the victim. The Appellate Division assumed, without finding, that the

procedure was suggestive and then determined that Myers' identification was nonetheless reliable based on her testimony. The trial record supports this conclusion. Myers testified that she knew defendant well because she regularly purchased drugs from him over the previous two years. (Ex. Rta6 at 18-91, 220-21, Dkt. No. 8-36; Ex. Rta7 at 31, Dkt. No. 8-37.) After the victim had apparently robbed Petitioner's drug stash, Myers testified that she saw Petitioner across the street from the victim and then he walked toward the victim and threatened to shoot his brains out. (Ex. Rta6 at 204-05, 245, Dkt. No. 8-36.) She saw the flash of the gun and that the victim was shot in the head and fell, and Petitioner ran off. (Id. at 217-19.)

The Appellate Division reasonably applied clearly established federal law when it ruled that Myers' knowledge of Petitioner as her drug dealer for the previous two years, combined with her opportunity to view the crime and describe it in detail rendered her identification of Petitioner reliable. See Neil v. Biggers, 409 U.S. 188, 199-200 (1972) ("the factors to be considered in evaluating the likelihood of misidentification include the opportunity of the witness to view the criminal at the time of the crime … [and] the accuracy of the witness' prior description of the criminal….")) Therefore, the Court denies ground one of the petition.

C.    Ground Two

For his second ground for relief, Petitioner claims the trial court improperly denied his motion for a new trial. (Pet. at 6, 17-19, Dkt. No. 1.) The motion for a new trial was based on a post-trial interview with Patricia Myers by defense investigator Maribel Mora. According to Petitioner, Myers told Mora that Investigator Bruno had called her during the murder investigation and said that it was her lucky day and then showed her two photos. Myers did not identify the first photo as depicting the shooter. When Investigator Bruno showed Myers Petitioner's photo, he told her to take her time. Twice she said that she was not sure. There was another photo sitting upside down on a nearby table that had a signature on the back. Myers thought that it was the same photo Investigator Bruno had been showing her and that someone had identified that person. Based on Investigator Bruno's words and attitude, together with the signature on the back of the overturned photo, Myers said she thought she was doing the right thing by identifying Petitioner.  Myers also denied seeing Petitioner go in a house and come out with a gun.

Myers acknowledged that when she was talking to defense counsel before the trial a state investigator interrupted the meeting. Myers said she had not spoken to the defense because Investigator Bruno repeatedly told her that the defense was her

enemy and was trying to confuse her. She also confirmed that the prosecutors paid for her shelter and food vouchers.

After the defense filed a motion for a new trial, the prosecutor's office interviewed Myers. She denied some of the things she had told the defense investigator in the post-trial interview. However, she did not retract her statements that Investigator Bruno had told her it was her lucky day or that she saw the overturned photo before identifying Petitioner. She would not confirm that these things had influenced her. This prompted another meeting between Myers and the defense investigator on August 10, 2010, and Myers signed and dated each page of the investigator's report. The report was submitted to the court in support of the motion for a new trial. Petitioner submits that he provided the state court with newly discovered evidence that called Myers' identification of him into doubt and established a Brady violation with respect to how the identification was conducted.

Respondent argues that the Appellate Division properly rejected Petitioner's claim on direct appeal and again on PCR appeal, affirming the trial court's finding that Petitioner had failed to establish any violation of Brady, and had failed to present newly discovered evidence warranting a new trial. (Answer at 67-78, Dkt. No. 8.)

In his traverse, Petitioner challenges the finding by the trial court that Myers' post-trial statements probably would not

have changed the jury's verdict, based on overwhelming evidence of his guilt. (Traverse at 23-24, Dkt. No. 9 at 28-29.) Petitioner contends the evidence was not overwhelming, it was based on testimony of drug users whose only motive was to obtain drugs. Petitioner seeks an evidentiary hearing on Myers' credibility, in light of the alleged newly discovered evidence.

1.  S*tate law claim*

State court decisions based on state law are not reviewable in a federal habeas petition. See Estelle v. McGuire, 502 U.S. 62, 67 (1991) ("federal habeas corpus relief does not lie for errors of state law") (internal quotation omitted). However, Petitioner alleged a Brady violation in his motion for a new trial. (Ex. Rta14, Dkt. No. 8-44.) Thus, the Court will review whether the state court's denial of Petitioner's Brady claim was based on an unreasonable determination of the facts in light of the evidence presented or whether the state court decision was contrary to, or involved an unreasonable application of clearly established federal law.

2.  *State court determination*

On direct appeal, the highest state court adjudication of Petitioner's Brady claim was the Appellate Division's October 17, 2013 opinion. The Appellate Division stated

> The [trial] judge found that defendant failed
> to establish a *Brady* violation. The judge
> determined that the State did not interfere

with defendant's right to speak with Myers. The judge noted that the State's representative had credibly stated that Myers could determine whether she would or would not speak with defense counsel, an assertion that Myers confirmed under oath. The judge also noted that if defense counsel believed his access to Myers had been impermissibly restricted, he could have filed a motion or issued a subpoena to Myers.

The judge additionally found that defendant had not presented newly discovered evidence warranting a new trial. The judge said Myers' post-trial statements were suspect because they were made after defendant's sister confronted and blamed her for defendant's conviction and asked her to recant. The judge noted that such circumstances were not conducive to producing credible statements. The judge found that Myers' posttrial statements were not material because they only addressed ancillary matters. Myers never denied that she knew defendant or recanted her statements as to what she had seen on the evening of June 9, 2008.

Furthermore, the evidence probably would not have changed the jury's verdict. As the judge found, the results of the Wade hearing would not have been different because defendant never established that there was a substantial likelihood that Myers had misidentified defendant. In addition, at trial, the State presented overwhelming evidence of defendant's guilt, wholly aside from Myers' testimony.

(Ex. Ra9 at 16-17, Dkt. No. 8-11.)

3. *Analysis*

Because the state courts denied this claim on the merits, habeas review is limited to the state court records, and Petitioner's request for an evidentiary hearing is denied.

Pinholster, 563 U.S. at 180-81 (2011). Petitioner has not identified a case factually similar to his such that habeas review to determine whether the decision was "contrary to" clearly established law is necessary. Therefore, the Court turns to whether the Appellate Division reasonably applied clearly established federal law.

There are three elements to a Brady claim; (1) the evidence is favorable to the accused because it is exculpatory or impeaching; (2) the evidence was suppressed by the State willfully or inadvertently; and (3) the evidence was material "such that prejudice resulted from its suppression." Dennis, 834 F.3d at 284–85 (quoting Strickler v. Greene, 527 U.S. 263, 282 (1999)). "The 'touchstone of materiality is a 'reasonable probability' of a different result.'" Id. at 285 (quoting Kyles v. Whitley, 514 U.S. 419, 434 (1995)). "A 'reasonable probability' of a different result is ... shown when the government's evidentiary suppression undermines confidence in the outcome of the trial." Id. (quoting Kyles, 514 U.S. at 434 (internal quotation marks omitted)).

First, the Appellate Division found the evidence was not exculpatory because Myers' post-trial statements concerning her pretrial identification of Petitioner were not a recantation of her testimony that Petitioner was the shooter. The record supports this finding, Myers did not recant her identification of Petitioner. (Ex. Ra5 (unnumbered), Dkt. No. 8-7 at 47-53, 69-89.)

Second, the Appellate Division agreed with the trial court that the newly discovered evidence was not material. This is also supported by the fact that Myers' stood firm in her identification of Petitioner. Third, the Appellate Division agreed with the trial court that the State did not interfere with Petitioner's right to speak with Myers before trial. The record shows the State assisted the defense by locating the witnesses and made them available to the defense. Finally, the Appellate Division addressed the materiality of the evidence and reasonably concluded that if the jury had been presented with Myers' post-trial statements, there was not a reasonable probability of a different result based on overwhelming evidence of Petitioner's guilt, even absent Myers' testimony. Based on the factual findings of the Appellate Division on direct appeal, none of the Appellate Division's legal conclusions, including overwhelming evidence of Petitioner's guilt, are objectively unreasonable. (Ex. Ra9 at 2-10, Dkt. No. 8-11.) Thus, Petitioner failed to show that the state courts' application of Brady was objectively unreasonable and the Court denies ground two of the petition.

    D.   <u>Ground Three</u>

In his third ground for relief, Petitioner contends that prosecutorial misconduct, singularly and in the aggregate, denied his due process right to a fair trial. (Pet. at 20-27, Dkt. No. 1.)

*1.  The witnesses' inconsistent testimony*

Petitioner alleges that the prosecutor, in her summation, failed to address the inconsistent testimony of the States' witnesses and gave a fictionalized account of Myers' testimony. (Pet. at 20-24, Dkt. No. 1.) On cross-examination Myers testified that she did not see Angela Bumpers or Walter Boyd at the scene of the murder. On redirect, the prosecutor suggested to Myers that she did not see Bumpers or Boyd because she was focused on finding a drug supplier. The prosecutor asked Myers if she would get high with Boyd and Bumpers, and when she responded no, the prosecutor gave the false impression that Myers would not have noticed their presence at the scene of the murder. Petitioner contends that the prosecutor gave a fictionalized account of Myers' testimony in her summation.

Respondents maintain that none of the prosecutor's comments in summation, taken alone or cumulatively, amounted to prosecutorial misconduct requiring reversal of Petitioner's conviction. (Answer at 78-81, Dkt No. 8.) Rather, the prosecutor's summation was fairly responsive to defense counsel's closing arguments and was supported by the evidence and reasonable inferences. Further, Respondents assert the jury charges were sufficiently curative of any potential for undue prejudice.

In his traverse, Petitioner urges the Court to review the inconsistent testimony of the witnesses and conclude that the

prosecutor knowingly used perjured testimony based on those inconsistencies and improperly argued the credibility of the witnesses in closing argument, in violation of his right to due process. (Traverse at 25-27, Dkt. No. 9 at 30-32.)

a. *State court determination*

On direct appeal, the Appellate Division denied this claim as follows.

> Defendant asserts that Myers, Boyd, Caraballo and Bumpers gave "glaring and irreconcilable" accounts in their testimony. According to defendant, the assistant prosecutor "must have known" that one, if not all, of these accounts was false or that there was a substantial likelihood this was so. Defendant contends that the assistant prosecutor improperly stated in her summation that, when the jurors examined all of the evidence, they would conclude that the witnesses had not contradicted each other. According to defendant, the statements cast "unjustified aspersions" upon his attorney, misstated the record and used "specious reasoning" to negate defense counsel's arguments. However, there is no basis in the record for defendant's contention that the assistant prosecutor knowingly adduced false testimony from any witness. The assistant prosecutor merely argued that the testimony of the witnesses as essentially consistent, and some variations in their accounts did not render the testimony contradictory or false. In making these remarks, the assistant prosecutor did not denigrate the defense. Moreover, defense counsel never objected to the comments, thereby indicating he did not view them to be as prejudicial.

(Ex. Ra9 at 18-19, Dkt. No. 8-11.)

b.   *Analysis*

Petitioner has not identified a case factually similar to his such as to require review of whether the Appellate Division's opinion is contrary to clearly established federal law. Habeas review, therefore, is limited to whether the Appellate Division's decision involved an unreasonable application of the due process standard governing prosecutorial misconduct. The Supreme Court has identified Darden v. Wainwright, 477 U.S. 168 (1986), as the clearly established federal law governing habeas review of prosecutorial misconduct claims. Parker v. Matthews, 567 U.S. 37, 45 (2012). In Darden, the Supreme Court "explained that a prosecutor's improper comments will be held to violate the Constitution only if they 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" Id. (quoting Darden, 477 U.S. at 181 (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974)). If the prosecutor made improper statements, the reviewing court must examine the prosecutor's statements "in context and in light of the entire trial, assessing the severity of the conduct, the effect of the curative instructions, and the quantum of evidence against the defendant." See Moore v. Morton, 255 F.3d 95, 107 (3d Cir. 2001) (discussing Donnelly.)

At trial, the defense made much of inconsistencies in the witnesses' testimony on cross-examination, and especially in his

summation. (Ex. Rta12 at 46-75, Dkt. No. 8-42.) The prosecution countered by arguing that the testimony of the witnesses was essentially consistent. (Id. at 75-110, Dkt. No. 8-42.) A prosecution has some leeway to respond to the defense theory. Darden v. Wainwright, 477 U.S. 168, 182 (1986); see e.g. United States v. Robinson, 485 U.S. 25, 34 (1988). "It is fundamental that counsel presenting a summation is free to repeat the evidence and even 'argue reasonable inferences from the evidence,' as long as counsel refrains from misstating the evidence." United States v. Hodge, 870 F.3d 184, 203 (3d Cir. 2017) (quoting United States v. Fulton, 837 F.3d 281, 306 (3d Cir. 2016) (quoting United States v. Carter, 236 F.3d 777, 784 (6th Cir. 2001)).

The prosecutor did not give a fictionalized account of Myers' testimony, as Petitioner contends. On direct examination, the prosecutor asked Myers if she noticed any drug addicts in the area around the time of the murder, and she said that she had not seen anyone. (Ex. Rta6 at 225, Dkt. No. 8-36 at 45.) Myers explained that she did not have any money and she was in the area hoping someone would come along and offer to get high with her. (Id. at 227, Dkt. No. 8-36 at 47.) Then, on cross-examination, defense counsel asked Myers if she saw Madonna Carabello, Angela Bumpers or Walter Boyd at the crime scene on the day of the murder, and she responded that she had not. (Id. at 229, Dkt. No. 8-36 at 49-54.) Defense counsel asked Myers whether, just before the shooting,

she was looking for people she knew so she could approach them for drugs, and she agreed. (Ex. Rta6 at 229-230, Dkt. No. 8-36 at 50.)

On re-direct the following exchange took place between the prosecutor and Myers:

> Q. Okay. Did you see anyone else next to Anthony Ball when he got shot by the defendant?
>
> A. No.
>
> Q. Nobody else was next to him?
>
> A. I didn't see anybody.
>
> Q. Okay, now you said yesterday that you're looking for people who would give you money for drugs or share their drugs with you. Was it just anybody or – let me finish – Just anybody or is it people that you know who have done that in the past?
>
> A. People I've known done it in the past.
>
> Q. Okay. So the individuals that Mr. Goins named for your [sic] yesterday are those individuals you would know would share with you? Do you remember who he –
>
> A. (Interposing) I remember them, one name, known her from the program. But, no, they were selfish.
>
> Q. Okay. Talking about Madonna?
>
> A. Yes.
>
> Q. Okay, if you had seen her, that is not really the person you're looking for?
>
> A. No.

Q. Okay. When you're out on the streets – past 559 [Pine St.], are you looking for particular people or just anybody?

A. Particular people.

Q. Okay. So if someone came in the area that you knew wasn't going to share with you, is that something that, you know, would stick in your head?

A. Yeah.

Q. That wasn't going to share with you?

A. Right.

Q. Okay.

A. I knew who would and who wouldn't.

Q. Okay. But would you make note of the people you saw who weren't going to share with you?

A. Oh, no.

(Ex. Rta7 at 24-26, Dkt. No. 8-37.)

Beginning with Myers' testimony that she did not see Angela Bumpers, in summation the prosecutor argued there was no way Myers could have seen Bumpers at the scene of the crime based on where they were standing. (Ex. Rta12 at 83-84, Dkt. No. 8-42.) As to Walter Boyd and Madonna Carabello, the prosecutor stated:

> Patricia Myers doesn't see Walter Boyd. Well, she said she's looking for people that would get her high. That's what she's looking for. That's what she's making mental notes for. I asked her, would Walter Boyd get (you high)? No. Would Madonna get [you high]? No. Are those the people you would make a mental note of? No. She agreed and said I know Madonna from the clinic, she's greedy, not going to

> share with me. Those are not the people she's
> making mental notes of. But, you had better be
> sure if she saw a friend of hers and that
> friend is someone she shared with before,
> that's the person she would make note of.

(Ex. Rta 12 at 84-85, Dkt. No. 8-42.)

Because Myers testified that she was looking for someone who would share their drugs and Boyd and Madonna Carabello would not, it is a reasonable inference that Myers would not have paid attention to their presence. Therefore, not every fairminded jurist would disagree with the Appellate Division's conclusion that the prosecutor's comments were not improper, and Petitioner is not entitled to habeas relief on this ground.

This Court finds, in the alternative, that even if the prosecutor's comments about Myers' testimony were improper because she embellished Myers' testimony about why she did not notice Walter Boyd's and Madonna Carabello's presence at the time of the murder, any prejudice was cured by the trial judge's instructions. The trial judge instructed the jury that speculation, conjecture "and other forms of guessing play no role in the performance of your duties[.]" (Id. at 120, Dkt. No. 8-42.) Further, the judge instructed the jury that they alone would determine the credibility of the witnesses and the amount of weight to give their testimony. (Id. at 123-24.) Notably, the judge instructed:

> Regardless of what counsel said or I may have
> said in recalling the evidence in this case,
> it is your recollection of the evidence should

guide you as judges of the facts. Arguments, statements, remarks, openings and closings or summations of counsel are not evidence and must not be treated as evidence. Although the attorneys might have pointed out what they thought was important in this case, you must rely solely upon your understanding and recollection of the evidence that was admitted during the trial. Whether or not the defendant has been proven guilty beyond a reasonable doubt is for you to decide based on all the evidence presented during the trial. Any comments by counsel are not controlling.

(Ex. Rta12 at 124, Dkt. No. 8-42.) Thus, the jury was instructed not to place too great of weight on closing arguments over their own views of the evidence. Regarding inferences drawn by the jury, the judge instructed "whether or not inferences should be drawn is for you to decide using your own common experience, knowledge and everyday life experiences. Ask yourself, it is probable, it is logical, is it reasonable." (Id. at 127-28, Dkt. No. 8-42.) In this context, not every fairminded jurist would disagree with the Appellate Division's conclusion that the prosecutor's description of Myers' testimony and the inferences to be drawn from it did not so infect the trial with unfairness as to deprive Petitioner of due process. See Rolan v. Coleman, 680 F.3d 311, 323-24 (3d Cir. 2012) (holding that in light of other evidence and curative jury instructions, prosecutor's potentially prejudicial comment did not deprive the petitioner of due process). Therefore, Petitioner is not entitled to habeas relief on this claim.

###### 2. *Petitioner's pretrial letter*

For his second allegation of prosecutorial misconduct, Petitioner contends the prosecutor argued in summation that an improper inference should be drawn from a letter Petitioner had written while in jail. (Pet. at 23-25, Dkt. No. 1.) In the letter, Petitioner wrote about the witnesses who had given information to the investigator. In summation, the prosecutor commented that Petitioner had not accused those witnesses of lying. The prosecutor, thus, implied that Petitioner knew the witnesses were telling the truth about what they saw at the crime scene. The defense objected and the court gave a limiting instruction, but Petitioner contends the curative instruction could not have cured the prejudice to the defense, and that this was an improper comment on Petitioner's decision not to testify at trial.

At trial, the contents of the letter were read into the record by Investigator James Bruno:

> Pup, what's good homey boy? Dig this. This is the paperwork on T.B., that rat ass nigga and I want you to make copies and send it to the streets and make sure everybody from downtown gets a copy of this. Dig me? Yo, pup, how come you never wrote me back and let me know whether or not you knew these people? Patricia Myers and Diane Bumpers, Walter Boyd, Madonna Carabello? Ask Ski if he knows them and give him a copy too, and tell him I said what's up and yo. Is Kevin Zip still here? Tell them niggas I said what's up and give them a copy too, and tell them to send this shit to the streets ASAP and write me back up. Philly P.S. What's up with your case, nigga? Holler at me.

(Ex. Rta10 at 157-58, Dkt. No. 8-40 at 161-62.)

In summation, the prosecutor stated,

> Ladies and gentlemen, I ask you to read that
> letter.
>
> You can make any inference. You can make no
> inference. You can make a totally innocent
> inference. Whatever you choose. But, the
> wording of the letter that is admittedly
> written and signed by Philly and --Ladies and
> gentlemen, you can draw any inference you like
> or no inference at all. But one of the
> inferences you can draw is what is not in this
> letter is any mention that these people are
> lying. The defendant doesn't call them a liar.
>
> He doesn't call any of these witnesses a liar.
> He chooses to send out the Discovery with a
> notation in which he calls T.B. a rat and he
> wants to know who knows these witnesses.
> Ladies and gentlemen, one of the things you
> are going to get from the judge is that you
> may – you can choose not to or you can infer
> this as consciousness of guilt.

(Ex. Rta12 at 105-6, Dkt. No. 8-42.)

The trial judge gave the jury the following instruction:

> Also it was stipulated that the defendant, for
> example, is the author of a letter that was
> written and mailed to Michael Davis. And you
> will get that letter in evidence. I gave you
> an instruction about that letter and the use
> of it and I'll do it again.

(Id. at 118.)

> Now I'm going to read you another charge I
> read you during the testimony concerning that
> correspondence. I'm going to talk about S-75
> and S-76 you are going to have in front of
> you. That is the letter that Defendant wrote

and mailed to Michael Davis. I'm going to reread that charge to you.

You've been provided with evidence that the defendant wrote and mailed a letter to Michael David [sic] which references some of the witnesses you've heard from during the trial.

The fact that the defendant wrote and mailed that letter, S-75 and the redacted document with the handwritten notes in evidence, S-76, is stipulated to by the parties.

You as the judges of the facts are to determine what, if any inferences can be drawn from the content of S-75 and S-76 in evidence. There may be one or more than one inference that can be drawn from the content of those writings.

The State asserts the language used by the defendant constitutes a consciousness of guilt and/or an attempt to influence witnesses which infers a consciousness of guilt.

It is for you as the judges of the facts to decide whether or not the statements show a consciousness of guilt and the weight, if any, to be given such evidence in light of all the other evidence in this case.

Now, as you know, the defendant, Daniel Locus, elected not to testify at trial. It is his constitutional right to remain silent. You must not consider for any purpose or in any manner in arriving at your verdict the fact that Mr. Petitioner did not testify at trial. That fact should not enter into your deliberations or discussions in any manner or at any time.

(Ex. Rta12 at 145-46, Dkt. No. 8-42.)

a.   *State court determination*

The Appellate Division denied this claim as follows.

> Defendant further argues that the assistant
> prosecutor improperly commented on a letter
> that defendant had written to another inmate,
> in which he referred to Braxton as a "rat" and
> mentioned the State's other witnesses by name.
> Defendant contends that the assistant
> prosecutor improperly asked the jury to draw
> an inference of guilt from the absence of any
> statement in the letter that Braxton or the
> other witnesses were liars.
>
> Even if the assistant prosecutor's comment was
> not sufficiently supported by the statements
> in the letter, the judge provided the jury
> with a curative instruction, in which he
> indicated that what the attorneys say is not
> evidence. Among other things, the judge told
> the jurors "to confine yourselves to the words
> of the letters and only the reasonable
> inferences, if any, you make with respect to
> the letters." In our view, the judge's
> instruction cured any potential for prejudice
> arising from the assistant prosecutor's
> comment.

(Ra9 at 19, Dkt. No. 8-11.)

   b.   *Analysis*

Petitioner has not identified a case so factually similar as to require "contrary to" habeas review of this claim. Therefore, the Court will address whether the Appellate Division reasonably applied the due process standard described in <u>Donnelly</u>. In <u>Donnelly</u>, the Supreme Court rejected habeas relief where the prosecutor made an improper remark during summation, finding the remark was not so prejudicial that its effect could not be mitigated by a curative instruction, and that the curative instruction given was strong. <u>Moore v. Morton</u>, 255 F.3d 95, 105–

06 (3d Cir. 2001) (citing <u>Donnelly</u> at 643–44.) In addition to considering any curative instructions, in making the due process determination, the Supreme Court directed that courts must also consider the strength of the evidence. <u>Id.</u> at 111 (citing <u>Darden</u>, 477 U.S. at 182, <u>Donnelly</u>, 416 U.S. at 644.)

The Appellate Division reasonably applied the correct due process analysis. First, the Appellate Division acknowledged that the prosecutor invited the jury to make an inference as to Petitioner's guilt based on the fact that he did not call the witnesses liars in his pretrial letter. Second, the Appellate Division found the curative instruction sufficient to mitigate any prejudicial effect. The trial court's instructions, recited above, support the Appellate Division's conclusion that the instruction was sufficient to mitigate any prejudicial effect.

It is important to point out, with regard to prejudice, that the prosecutor did not tell the jury they should infer Petitioner's guilt because he did not testify at trial, but rather that they could choose whether or not to make an inference based on the text of the letter. Further, as required, the Appellate Division considered the strength of the evidence, and stated, "at trial, the State presented overwhelming evidence of defendant's guilt[.]" (Ra9 at 17, Dkt. No. 8-11.) For the same reason, even if the prosecutor's comments were improper, the error was harmless. <u>See</u> <u>Johnson v. Lamas</u>, 850 F.3d 119, 132–33 (3d Cir. 2017) (under

harmless error standard "we may grant relief only if we have a 'grave doubt' as to whether the error at trial had a substantial and injurious effect or influence." (quoting Davis v. Ayala, ---U.S. ----, 135 S.Ct. 2187, 2198 (2015) (quoting O'Neal v. McAninch, 513 U.S. 432, 436 (1995)).

Therefore, the Appellate Division reasonably applied clearly established federal law in rejecting Petitioner's claim of prosecutorial misconduct in violation of his right to due process.

### 3. *Petitioner's arraignment statements*

For his third allegation of prosecutorial misconduct, Petitioner alleges that the prosecutor read only a portion of the statement he made at his arraignment, and that it was taken out of context. (Pet. at 24-25, Dkt. No. 1.) In summation, the prosecutor read the following portion of Petitioner's statement:

> They got no gun, no motive, and no nothing. How they got a strong case? They got three crack heads that will say anything. That's a strong case?

(Id. at 24.) The prosecutor invited the jury to infer Petitioner was the perpetrator and had disposed of the gun, because he somehow knew that the prosecution had not recovered the gun although the information was never made public. Petitioner, however, contends his statement was a simple denial of his guilt, and his speculation that the witnesses would be crackheads because the murder took place in a drug infested neighborhood. Petitioner asserts there

was no evidence that he disposed of a gun, and it was not reasonable
to infer he had disposed of a gun simply because the prosecution
had not recovered one.

a. _State court determination_

The Appellate Division discussed this claim as follows.

> In addition, defendant contends that the
> assistant prosecutor improperly referred to
> certain statements he made when he was
> arraigned on the charges related to Ball's
> shooting. At the arraignment, defendant
> asserted his innocence and said that the
> State's case was baseless because "[t]hey got
> no gun, no motive, no nothing." The assistant
> prosecutor noted in her summation that, at the
> time of the arraignment, the fact that the gun
> used in the shooting had not been recovered
> had not been publicly disclosed. She said that
> the jury could draw a reasonable inference
> that defendant knew the State did not have the
> gun because defendant had disposed of the
> weapon.
>
> Defendant contends that, in these remarks, the
> assistant prosecutor improperly asked the jury
> to reach a conclusion that was not supported
> by the evidence. However, in our view, the
> assistant prosecutor's remarks were a fair
> comment on the evidence. The assistant
> prosecutor properly asked the jury to draw the
> reasonable inference that defendant knew the
> State had not recovered a gun because he had
> disposed of it. Defense counsel did not object
> to the comment, thereby indicating he did not
> consider it to be prejudicial.
>
> Defendant's other arguments regarding the
> assistant prosecutor's summation are without
> sufficient merit to warrant discussion. R.
> 2:11-3(e)(2).

(Ra11 at 20, Dkt. No. 8-11.)

b. *Analysis*

"A 'prosecutor is entitled to considerable latitude in summation to argue the evidence and any reasonable inferences that can be drawn from that evidence.'" United States v. Hernandez, 412 F. App'x 509, 511 (3d Cir. 2011) (quoting United States v. Lee, 612 F.3d 170, 194 (3d Cir. 2010) (quoting United States v. Werme, 939 F.2d 108, 117 (3d Cir. 1991)). The prosecutor's remark was supported by the following evidence. Assistant Prosecutor Ira Slovin, Deputy Chief of the Homicide Unit for the Prosecutor's Office, testified that he handled Petitioner's case through indictment, and no discovery was released in the case before the arraignment. (Ex. Rta9 at 173-75, Dkt. No. 8-39.) He further testified that, prior to the arraignment, there had been no press release revealing that a weapon was never recovered, and no witnesses were identified or ever referred to as "crack heads." (Id. at 175-77.) Based on this evidence, the Appellate Division reasonably concluded it was not improper for the prosecutor to invite the jury to make a reasonable inference that Petitioner had disposed of the gun because he knew it had not been recovered.

Even assuming the prosecutor's comment was improper,[3] any prejudice was mitigated because, as discussed above, the jury was

---

[3] This case is distinguishable from United States v. Balter, 91 F.3d 427, 438-39 (3d Cir. 1996), where the Third Circuit Court of Appeals held that the prosecutor committed harmless error by commenting, in summation, on the defendant's post-arrest silence

instructed that a prosecutor's remarks are not evidence, and it is for the jury to determine what reasonable inferences might be drawn from the evidence. (Ex. Ra9 at 19, Dkt. No. 8-11.) See Donnelly, 416 U.S. at 644 ("[i]n addition, the trial court took special pains to correct any impression that the jury could consider the prosecutor's statements as evidence in the case.") Therefore, the Appellate Division's denial of this claim was not objectively unreasonable under clearly established federal law, and habeas relief is denied. Alternatively, assuming the prosecutor's comments were improper, the error was harmless. See Johnson, 850 F.3d at 132–33 (3d Cir. 2017) (under harmless error standard "we may grant relief only if we have a 'grave doubt' as to whether the error at trial had a substantial and injurious effect or influence") (quoting Davis v. Ayala, --- U.S. ----, 135 S.Ct. 2187, 2198 (2015) (quoting O'Neal v. McAninch, 513 U.S. 432, 436 (1995)). At trial, Myers testified that she saw Petitioner shoot the victim, and other witnesses placed Petitioner at the scene of the crime. Under the circumstances, this Court does not have grave doubts of

---

during the reading of the Indictment, after the defendant had called the investigator from jail to make a deal, asserting his co-defendant was the shooter. Here, the prosecutor commented not on Petitioner's post-arrest silence, but on his inculpatory statements during arraignment. The transcript of the arraignment is not part of the record here. This Court assumes that the trial court followed N.J. Ct. R. 3:4-2 (d)(3) "Procedure in Indictable Offenses" and advised defendant of the right to remain silent and that any statement may be used against him.

improper influence on the jury verdict by the prosecutor's comment on Petitioner's arraignment statements about the prosecution's weak case because they failed to recover a gun and had three crack head witnesses.

### 4. C*redibility of the witnesses*

Petitioner's fourth allegation of prosecutorial misconduct is based on the prosecutor's argument to the jury that they should prove the defendant was wrong, "[b]ecause the defendant is counting on you to feel the same wa[y] he feels, that these are crackheads who are not worthy of our beliefs in any way." (Pet. at 25-26, Dkt. No. 1.) Petitioner contends these remarks were prejudicial because the prosecutor invited the jury to reach a guilty verdict not based on the lack of reasonable doubt, but to prove they disagreed that drug addicts are not worthy of belief.

The Appellate Division rejected this claim.

> Defendant had referred to the State's witnesses as "crack heads" when he was arraigned, and the assistant prosecutor reasonably stated that defendant was "counting" on the jury to reject their testimony as lacking credibility because of their involvement with drugs. Indeed, defense counsel had made that point in his summation. There was nothing improper about the assistant prosecutor's remarks.

(Ex. Ra9 at 20-21, Dkt. No. 8-11.)

"In evaluating whether the remarks of the prosecutor rise to the level of a constitutional violation, [courts] are required to

examine those remarks in the context of the whole trial." <u>Werts v.</u>
<u>Vaughn</u>, 228 F.3d 178, 198 (3d Cir. 2000) (citations omitted). The
Appellate Division did so here, noting Defendant had referred to
the witnesses as "crack heads" during his arraignment, and the
defense counsel urged the jury not to find the testimony of drug
addicts credible. Additionally, viewed in the totality of the
circumstances, including the curative instruction that a
prosecutor's arguments are not evidence, and reliance on the
overall strength of the prosecution's case, the Appellate Division
reasonably rejected this claim. <u>See</u> <u>Moore v. Morton</u>, 255 F.3d 95,
112–13 (3d Cir. 2001) ("[w]hen the evidence is strong, and the
curative instructions adequate, the Supreme Court has held the
prosecutor's prejudicial conduct does not deprive a defendant of
a fair trial.") Petitioner is not entitled to habeas relief on
this claim.

     5.  <u>The cumulative effect of prosecutorial misconduct</u>

     Petitioner argues that the cumulative effect of the
prosecutor's misconduct, including the prosecutor's denial of
contradictions in the witnesses' testimony, comments on
Petitioner's arraignment, and cajoling the jury to disavow
Petitioner's belief that drug addicts are incapable of giving
credible testimony, deprived him of due process. (Pet. at 20-27,
Dkt. No. 1.)

       a.  *State court determination*

The Appellate Division recognized that Petitioner alleged that the singular *and cumulative effect* of prosecutorial misconduct deprived him of due process, however, the court addressed each instance of alleged misconduct singularly. (Ex. Ra9 at 17, Dkt. No. 8-11.) The Appellate Division did not find any instances of prosecutorial misconduct, therefore, there was nothing for it to address in the cumulative. The Appellate Division nonetheless considered the potential prejudicial effect of certain of the prosecutor's statements and in each instance found that Petitioner was not deprived of due process in the context of the overall trial record. (Ex. Ra9 at 17, Dkt. No. 8-11.)

        b. *Analysis*

"The cumulative effect of the prosecutor's actions must be reviewed against the standard of whether they 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" Scherzer v. Ortiz, 111 F. App'x 78, 88 (3d Cir. 2004) (quoting Donnelly, 416 U.S. at 643.) "[A] judgment of conviction is commonly the culmination of a trial which includes testimony of witnesses, argument of counsel, receipt of exhibits in evidence, and instruction of the jury by the judge." Donnelly, 416 U.S. at 645. Under the deferential standard of habeas review, whether every fair-minded jurist would disagree with the Appellate Division's determination that none of the prosecutor's comments were improper, must be affirmed. As discussed above, in each

instance of alleged prosecutorial misconduct, the Appellate Division gave a reasonable explanation why the prosecutor's statements were fair comments on the evidence.

Second, the Appellate Division also considered the effect of curative jury instructions on statements by the prosecutor that might have been prejudicial. The Appellate Division noted that the trial court instructed the jury that counsel's arguments are not evidence. (Ex. Ra9 at 19, Dkt. No. 8-11.) The Appellate Division also considered that the strength of the evidence against Petitioner rendered it unlikely that the prosecutor's statements infected the trial with unfairness. (Id. at 16-17.) The trial record supports the Appellate Division's conclusion concerning the strength of the prosecution's case based on eyewitness testimony, Braxton's testimony about his jailhouse conversation with Petitioner, the letter written by Petitioner to Davis, and Petitioner's statements at the arraignment. Therefore, the Court denies the claim of prosecutorial misconduct based on the cumulative effect of prejudice, and denies ground three of the petition in its entirety. See Fahy v. Horn, 516 F.3d 169, 204 (3d Cir. 2008) (where the prosecutor's comments were either not improper, or if they were improper, not prejudicial. their cumulative effect could not have deprived the defendant of a fair trial.)

E.    Ground Four

In his fourth ground for relief, Petitioner asserts that the jury instructions were inadequate and caused undue prejudice, depriving him of a fair trial. (Pet. at 28-29, Dkt. No. 1.) Further, he claims the trial court failed to mold the model jury instruction for in-court and out-of-court identifications to the evidence in the case. Petitioner argues that due process required the trial court to instruct the jury of the following: (1) Myers was the only eyewitness who claimed to have seen Petitioner shoot the victim; (2) Myers' identification of Petitioner was a "show-up" identification; (3) studies show that "show-up" identifications are inherently suggestive; (4) the jury was required to reject Myers' in-court and out-of-court identifications if it found they were a product of a show-up procedure and there was no reliable independent source upon which Myers' identified Petitioner; and (5) the factual contradictions in the eyewitnesses' accounts. Petitioner contends that the prosecutor misled the jury to believe the four eyewitnesses identified Petitioner and did not contradict each other. In opposition, Respondents contend the Appellate Division properly rejected Petitioner's claim. (Answer at 81-84, Dkt. No. 8.) Respondents further argue that the jury instruction claim rested

purely on matters of state law, and therefore, Petitioner fails to raise a constitutional issue.

       1.   *Standard of review for due process claim based on erroneous or ambiguous jury instructions*

In <u>Estelle v. McGuire</u>, the Supreme Court explained when an erroneous or ambiguous jury instruction rises to the level of a due process violation.

> The only question for us is "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." *Cupp v. Naughten*, 414 U.S. 141, 147, 94 S.Ct. 396, 400-01, 38 L.Ed.2d 368 (1973); *see also Henderson v. Kibbe*, 431 U.S. 145, 154, 97 S.Ct. 1730, 1736-37, 52 L.Ed.2d 203 (1977); *Donnelly v. DeChristoforo*, 416 U.S. 637, 643, 94 S.Ct. 1868, 1871, 40 L.Ed.2d 431 (1974) ("'[I]t must be established not merely that the instruction is undesirable, erroneous, or even "universally condemned," but that it violated some [constitutional right]'"). It is well established that the instruction "may not be judged in artificial isolation," but must be considered in the context of the instructions as a whole and the trial record. *Cupp v. Naughten*, *supra*, 414 U.S., at 147, 94 S.Ct., at 400-01. In addition, in reviewing an ambiguous instruction such as the one at issue here, we inquire "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way" that violates the Constitution. *Boyde v. California*, 494 U.S. 370, 380, 110 S.Ct. 1190, 1198, 108 L.Ed.2d 316 (1990). And we also bear in mind our previous admonition that we "have defined the category of infractions that violate 'fundamental fairness' very narrowly." *Dowling v. United States*, 493 U.S. 342, 352, 110 S.Ct. 668, 674, 107 L.Ed.2d 708 (1990). "Beyond the specific guarantees

> enumerated in the Bill of Rights, the Due
> Process Clause has limited operation." *Ibid.*

502 U.S. 62, 72-73 (1991) (footnote omitted).

### 2. *Exhaustion of claim in state courts*

"The exhaustion rule requires applicants to 'fairly present' federal claims to state courts before bringing them in federal court." McCandless, 172 F.3d at 260 (citations omitted). In the state courts: (1) Petitioner failed to allege the jury instructions violated his right to due process; (2) Petitioner did not rely on the constitutional standard for due process claims; and (3) Petitioner did not cite to federal law or a state case citing to federal law. (Ex. Ra4 at 115-119, Dkt. No. 8-6 at 122-26; Ex. Ra8, Dkt. No. 8-8.) "[A] passing reference to the concept of a 'fair trial' is not sufficient to fairly present a federal due process claim in state court." Keller, 251 F.3d at 415. Thus, Petitioner did not fairly present the federal nature of his due process claim before the state courts and failed to exhaust this claim. Nonetheless, a habeas court may deny an unexhausted claim on the merits, and this Court would do so here. 28 U.S.C. § 2254(b)(2).

### 3. *State court determination*

The Appellate Division made the following factual determinations concerning Myers' pretrial identification of Petitioner.

> Myers told [Investigator] Bruno she was
> present at the time [of the murder] and the

> man responsible was her drug dealer, from whom she had purchased drugs on a regular basis over two years, including the night of the murder. … Bruno showed Myers a photograph of Williams, but she said he was not the shooter. Bruno thereafter asked the police intelligence unit to compile a book of photographs of persons who had been arrested in the area of Lawrence's House, or who had some connection to the area. The book contained twenty-two photos, including photos of Williams and defendant.

In the meantime, Bumpers, Carabello and Boyd identified Petitioner as the shooter from the photo array.

> The following day, Bruno met with Myers to determine if defendant was the person whom she saw shoot Ball. Bruno showed Myers a picture of defendant, but did not tell Myers who he was or whether any other witnesses had identified him. Myers identified defendant as the shooter.

(Ex. Ra9 at 6-8, Dkt. No. 8-11.)

The Appellate Division held that "the judge instructed the jury in accordance with the then-applicable model jury instructions. Model Jury Charge (Criminal), 'Identification: In-Court and Out-of-Court Identifications' (6/4/07)". (Ex. Ra9 at 14, Dkt. No. 8-11.) The trial judge instructed the jury that "it is your function to determine whether the witnesses' identification of the defendant is reliable and believable." (Ex. Rta12 at 136, Dkt No. 8-42.)

4. *Analysis*

Petitioner's claim is largely based on his allegation that Myers' out-of-court identification of him was based on a show-up procedure. A "show-up" is an identification procedure "in which a single individual arguably fitting a witness' description is presented to that witness for identification." United States v. Brownlee, 454 F.3d 131, 138 (3d Cir. 2006).

In the Third Circuit, a habeas petitioner who challenges state court jury instructions must "point to a federal requirement that jury instructions ... must include particular provisions," or demonstrate that the jury "instructions deprived him of a defense which federal law provided to him." Johnson v. Rosemeyer, 117 F.3d 104, 111 (3d Cir. 1997). Petitioner has not identified a federal requirement that jury instructions include a specific instruction concerning show-up procedures.

The reliability of Myers' identification also weighs against the necessity for a special jury instruction. It is of consequence that Myers was not asked to identify a stranger but rather her drug dealer, with whom she had recent and frequent contact. Under the circumstances, asking Myers whether a person depicted in a single photograph was her drug dealer whom she witnessed shooting Anthony Ball, was not so prejudicial that a special jury instruction about the inherent suggestiveness of a show-up procedure was required. See United States v. Wade, 388 U.S. 218, 241, n. 33 (1967) (noting that how well the witness knows the

suspect will have an important bearing on the true basis of the witness' in court identification); <u>U.S. v. Waters</u>, 428 F. App'x 155, 164-65 (3d Cir. 2011) (finding show-up procedure did not create substantial risk of misidentification under totality of the circumstances.)

Petitioner also argues that the trial judge should have instructed the jury on the inconsistencies of the witnesses' testimony. Defense counsel, in summation, described the inconsistencies in detail. (Ex. Rta12 at 44-75, Dkt. No. 8-42.) The trial judge instructed the jury

> Now as judges of the facts you are to determine the credibility of the witnesses and in determining whether a witness is worthy of belief and therefore credible, you make take into consideration:
>
> the appearance and demeanor of the witness; the manner in which he or she might have testified; the witness' interest in the outcome of the trial, if any; his or her means of obtaining knowledge of the facts; the witness' power of discernment, meaning their judgment, their understanding; the witness' ability to reason, observe, recollect and relate; the possible bias, if any, in favor of the side for whom the witness testified; the extent to which, if at all, each witness is either corroborated or contradicted, supported or discredited by other evidence; whether the witness testified with an intent to deceive you; the reasonableness or unreasonableness of the testimony the witness has given; whether the witness made any inconsistent or contradictory statements; and any and all other matters which serve to support or discredit his or her testimony.

(Ex. Rta12 at 128-29, Dkt. No. 8-42.) Here, the jury instructions regarding witness credibility acknowledged that inconsistent statements by witnesses should be assessed in determining credibility, and defense counsel pointed out inconsistencies in summation. Further, Petitioner has not shown how the jury instructions deprived him of a defense. The jury instructions on witness credibility were not prejudicial and the trial court properly instructed the jury on reasonable doubt.[4] Therefore, the Court denies the unexhausted due process claim in ground four of the petition.

F.   Ground Five

For his fifth ground for relief, Petitioner alleges that Braxton's testimony was irrelevant and prejudicial and deprived him of a fair trial. (Pet. at 30-32, Dkt. No. 1.) Braxton testified on direct examination that he was placed in protective custody after Petitioner put out word on the street that Braxton was a snitch. On cross-examination, Braxton said that he told Petitioner, during a pretrial jailhouse conversation, that if Petitioner did not commit the murder, he should tell the police who did, and that Braxton would not take the blame for someone else if he was innocent. Petitioner argues this testimony suggested

---

[4] The trial judge instructed, in part, "a reasonable doubt is an honest [a] reasonable uncertainty in your minds about the guilt of the defendant after you have given full and impartial consideration to all the evidence." (Rta12 at 122-23, Dkt. No. 8-42.)

to the jury that Petitioner would have testified if he was not guilty. Respondents contend that Ground Five of the petition is procedurally defaulted and lacks merit. (Answer at 84-93, Dkt. No. 8.) In his traverse, Petitioner explained,

> This argument relied on the facts of the trial court's inadequate jury instructions based on the prejudicial testimony. Although, coupled together concerning the "challenge to the testimony by Mr. Braxton," the jury instructions where [sic] not cured by the testimony nor where [sic] the trial court's instructions adequate enough to cure the prejudice endured by the testimony, and thus, interfered with his defense that, "he was not the culprit" of the crime accused.

(Traverse at 28, Dkt. No. 9 at 33.)

1. *State court determination*

On direct appeal, the Appellate Division denied this claim.

> Defendant also argues he is entitled to a new trial because of statements that Braxton made while testifying. In his direct testimony, Braxton stated that he requested protective custody for himself and his wife upon his release from jail. Defendant maintains that Braxton's statement was "highly inflammatory" because it suggested that Braxton and his wife needed the State's protection after Braxton implicated defendant in Ball's murder.
>
> However, on cross-examination, defense counsel asked Braxton if his request for protective custody was merely a request to have the State help pay for the hotel where he and his wife were staying. Braxton agreed. Defense counsel further elicited testimony from Braxton confirming that no one was posted outside the hotel room to protect Braxton and his wife while they were staying there, and Braxton had not sought protective custody

while he was in jail. Defense counsel did not object to Braxton's comment. We conclude the comment did not prejudice defendant.

Defendant additionally claims he was prejudiced by certain statements Braxton made during cross-examination. Braxton confirmed that he told defendant that if he did not shoot Ball, he should tell the police who did. Braxton added that he would not spend thirty or forty years in jail for something someone else did. He also stated, "If I didn't do it, I wouldn't be sitting here." Defendant contends that Braxton's comments suggested that the fact that defendant was on trial "was evidence of his consciousness of guilt[.]"

However, as the State argues, Braxton's comments were a statement as to what he believed, not a statement about what defendant thought. Indeed, there was no evidence showing that defendant shared Braxton's views on this particular topic. We therefore conclude that defendant was not prejudiced by Braxton's comments.

(Ex. Ra9 at 21-23, Dkt. No. 8-11.)

2.  *Exhaustion of federal claim*

In the state courts, Petitioner failed to allege admission of Braxton's testimony violated his right to due process; he did not rely on the constitutional standard for due process claims or cite to federal law or a state case citing to federal law. (Ex. Ra4 at 126-30, Dkt. No. 8-6; Ra6, Dkt. No. 8-8; Ex. Ra8, Dkt. No. 8-10.) Thus, Petitioner failed to exhaust this claim. A habeas court, however, may deny an unexhausted claim on the merits. 28 U.S.C. § 2254(b)(2).

3.  *Merits of the unexhausted claim*

Where admission of certain evidence is alleged to violate due process, the familiar standard of whether the alleged error so infected the entire trial with unfairness governs habeas review. Estelle v. Gamble, 502 U.S. 62, 67-68 (1991); Keller, 251 F.3d at 416, n. 2 ("A federal habeas court is limited to deciding whether the admission of the evidence rose to the level of a due process violation.") Petitioner objects to admission of Braxton's testimony that he sought protective custody for himself and his wife upon his release from jail because it implies that Petitioner presented a danger to them. (Pet. at 30-32, Dkt. No. 1.)

On cross-examination, defense counsel questioned Braxton about his request for protective custody. "You said protective custody. What you're talking about is someone paid for your hotel room, is that correct?" (Ex. Rta10 at 29, Dkt. No. 8-40). Braxton agreed. (Id.) Defense counsel had Braxton confirm that no one was stationed outside of his hotel room to protect him and he was "free to go about [his] life." (Id. at 29-31.) Defense counsel also elicited Braxton's testimony that he declined witness protection while in jail. (Id. at 90-91; Ex. Rta11 at 48, Dkt. No. 8-41.) Furthermore, Investigator Bruno disclaimed that Braxton and his wife were in protective custody but that they were homeless; he said, "I don't want to say protective custody, they aren't in our custody. We made arrangements for them to have a place to stay so we know they are safe...." (Ex. Rta11 at 44, Dkt. No. 8-41.)

Viewing Braxton's testimony as a whole, it did not infect the entire trial with unfairness depriving Petitioner of due process.

Petitioner also challenged Braxton's testimony that he told Petitioner that if he did not shoot Ball he should tell the police who did, and that Braxton would not allow himself to go to prison for thirty or forty years if he was innocent. On cross-examination, Braxton testified:

> COUNSEL: Do you remember about the hundred dollars? Was that you explaining to [Petitioner] you both were making a hundred dollars a day, you don't get in trouble for a murder?
>
> BRAXTON: Don't go around shooting and beating no people for a hundred dollars a day.
>
> COUNSEL: Right....Didn't you tell my client he should go and tell who did it because it's not worth a hundred dollars to be going to jail for?
>
> BRAXTON: Yeah.
>
> COUNSEL: And because –
>
> BRAXTON: (Interposing) I said "If you didn't do it, if you didn't do it...tell them who did it, so you can get yourself out of there". You know what I mean? "If you didn't do it, go ahead and tell", because I'm not going to do thirty, forty years for somebody else. It's not heard of. We wouldn't be standing here in front of these people, them people, the jurors and the judge. If I didn't do it, I wouldn't be sitting here."

[Ex. Rta10 at 42, Dkt. No. 8-40.]

Defense counsel clarified that Braxton's testimony was not a comment on Petitioner's decision not to testify at trial but rather a comment on Braxton's opinion that Petitioner should cooperate if he knew the murderer. It is significant that the prosecutor did not argue the jury should draw any inference based on Braxton's opinion that Petitioner should cooperate. (Ex. Rta12 at 75-110, Dkt. No. 8-42.) In context of the entire trial and based on the strength of the prosecution's evidence, Braxton's testimony in this regard did not so infect the trial with unfairness as to constitute a violation of due process. Therefore, the Court denies the unexhausted claim in ground five of the petition.

G.  <u>Ground Six</u>

In his sixth ground for relief, Petitioner argues the trial court deprived him of a presenting a complete defense by not permitting him to argue the victim was killed by a third-party. (Pet. at 33-35, Dkt. No. 1.) At trial, defense counsel sought to raise the issue that the victim's mother, during discovery, said the victim had a reputation for stealing drug dealers' stashes and, as a result, he had been shot in 2004 and 2006. Defense counsel wanted to present testimony that the prosecutor was looking into whether this shooting was related to the 2004 and 2006 shootings. The trial court excluded any testimony about the prior shootings and excluded the defense that a third party committed the murder.

Respondents submit that these claims do not implicate the Constitution, and nevertheless were properly disposed of in the state courts. (Answer at 93-101, Dkt. No. 8.) Petitioner raised this claim on direct appeal as a violation of his constitutional right to present a meaningful defense. (Ra4 at 124, Dkt. No. 8-6 at 131.) It is, therefore, exhausted and properly raised for habeas review.

1. *State court determination*

The Appellate Division addressed this claim on direct appeal as follows.

> "A defendant is entitled to prove his innocence by showing that someone else committed the crime with which he or she is charged." State v. Jimenez, 175 N.J. 475, 486 (2003) (citing State v. Koedatich, 112 N.J. 225, 297 (1988), cert. denied, 488 U.S. 1017, 109 S. Ct. 813, 102 L. Ed. 2d 803 (1989); State v. Sturdivant, 31 N.J. 165, 179 (1959), cert. denied, 362 U.S. 956, 80 S. Ct. 873, 4 L. Ed. 2d 873 (1960)). "The right to the defense of third-party guilt is of constitutional dimension." Ibid. (citing Koedatich, supra, 112 N.J. at 297).
>
> However, the proof of third-party guilt must have "'a rational tendency to engender a reasonable doubt with respect to an essential feature of the State's case.'" Id. at 487 (quoting Sturdivant, supra, 31 N.J. at 179). It is "'not enough to prove some hostile event and leave its connection with the case to mere conjecture.'" Ibid. (quoting Sturdivant, supra, 31 N.J. at 179). The evidence must establish "'some thread capable of inducing reasonable men to regard the event as bearing on the State's case.'" Ibid. (quoting Sturdivant, supra, 31 N.J. at 179).

The record shows that, shortly before the trial, defense counsel asked the State to provide discovery related to two incidents in which Ball was allegedly shot. Ball's mother apparently believed that her son was previously shot for stealing drug stashes. The State could not provide information about one of the alleged shootings, but provided discovery concerning the other incident, including information that Tyhune Jones had been convicted for that shooting.

However, Jones was incarcerated on June 9, 2008, when Ball was fatally shot. Defense counsel said that he was seeking other evidence in an effort to show that Jones could have been responsible for Ball's death, perhaps through an accomplice. At the time of trial, Ball's mother was deceased. In addition, defense counsel did not proffer the evidence he wanted to present and even conceded that he did not have evidence that Ball had previously suffered gunshot wounds. The judge ruled that defendant would not be able to present evidence concerning the two alleged shootings. The judge found the assumption that the June 9, 2008 shooting was related to the earlier incidents was "mere conjecture" and the evidence did not meet the threshold required for admission on the issue of third party guilt.

The judge noted that Jones was in jail at the time Ball was murdered, and it would not have been possible for him to have committed that offense. The judge nevertheless permitted defense counsel to question Bruno about the prior shootings, as part of an inquiry into whether his investigation was thorough.

The record fully supports the judge's ruling. Defendant failed to proffer sufficient evidence to raise an inference of third-party guilt.

(Ra9 at 23-25, Dkt. No. 8-11.)

2. *Analysis*

Petitioner has not set forth a factually similar Supreme Court case that governs this claim on habeas review. Therefore, this Court looks to whether the Appellate Division reasonably applied clearly established Supreme Court precedent. The Supreme Court, in <u>Holmes v. South Carolina</u>, described the right to present a complete defense.

> [T]he Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" *Crane v. Kentucky*, 476 U.S. 683, 690, 106 S.Ct. 2142, 90 L.Ed.2d 636. This right is abridged by evidence rules that "infring[e] upon a weighty interest of the accused" and are " 'arbitrary' or 'disproportionate to the purposes they are designed to serve.'" *United States v. Scheffer*, [523 U.S. 303] at 308, 118 S.Ct. 1261. [1998].… [W]ell-established rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury. An application of this principle is found in rules regulating the admission of evidence proffered by criminal defendants to show that someone else committed the crime with which they are charged. Such rules are widely accepted….

547 U.S. 319, 320 (2006).

The Appellate Division's determination of this claim was objectively reasonable because the probative value of evidence that Petitioner was shot twice in the past and had a reputation for stealing drug stashes was outweighed by other factors. Only one of the individuals who previously shot Ball was ever

identified, and he was serving a state prison sentence at the time of Ball's murder. Thus, at a minimum, fairminded jurists could disagree with the Appellate Division's conclusion that the evidence of third party guilt did not rise above "mere conjecture." Therefore, the Court denies ground six of the petition.

H.   Ground Seven

For his seventh ground for relief, Petitioner argues the trial court violated his right to due process by admitting testimony about his involvement in a drug set. (Pet. at 36-39, Dkt. No. 1.) Investigator Bruno testified at Rule a 404(b) evidentiary hearing that Ernest Braxton gave a statement about seeing Petitioner with a gun, and that he knew Petitioner sold drugs. At trial, other witnesses were allowed to testify about drug transactions they engaged in with Petitioner. The trial court instructed the jury that the evidence was admitted to prove motive and identification and not that the defendant must have committed the murder because he committed past crimes. Petitioner contends the instruction was an oversimplification that fell far short of correcting the prejudice. Respondents submit the Appellate Division properly rejected this claim, finding the arguments to be without sufficient merit. (Answer at 33, Dkt. No. 8 at 33.)[5] In his traverse,

---

[5] Respondents also assert that this claim is not cognizable on habeas review because it raises a challenge under state evidentiary law. However, Petitioner presented this claim on direct appeal

Petitioner argues that he was not arrested, charged, nor indicted and/or convicted of selling drugs in connection with the case for which he was tried. (Traverse at 34, Dkt. No. 9 at 39.)

1. *State court determination*

The Appellate Division, on direct appeal, addressed this claim as follows:

> In his supplemental brief, defendant argues that the judge committed plain error by allowing the State to use his out-of-court statement concerning his involvement with the sale of illegal narcotics. Defendant contends that the judge did not undertake a proper analysis under *State v. Cofield*, 127 N.J. 328 (1992). He further argues that the judge's limiting instructions regarding this evidence were inadequate. In our view, these arguments are without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(2).
>
> Suffice it to say, however, the judge conducted a pre-trial hearing concerning this evidence and made the findings required by *Cofield* for its admission. The judge also gave the jury detailed instructions on the manner in which the jury could consider this evidence.
>
> Furthermore, defendant's attorney did not object to the instructions. Defendant's contention that the instructions were not properly tailored to the facts of this case, and failed to provide guidance on how the jury could use the evidence, are meritless.

(Ex. Ra9 at 25-26, Dkt. No. 8-11.)

---

under both state law and as a federal constitutional claim. (Ex. Ra6 at 9, Dkt. No. 8-8.)

2.   *Analysis*

Although the Appellate Division stated these "arguments are without sufficient merit to warrant discussion in a written opinion" it briefly discussed the argument and gave reasons for rejecting the claim. Therefore, the deferential standard of habeas review requires this Court to determine if all fairminded jurists would disagree with the Appellate Division's denial of this claim. The Appellate Division relied, in part, on the pretrial Rule 404(b) hearing held on May 10, 2009. In that hearing, Investigator Bruno testified that he took Ernest Braxton's statement on July 25, 2008, and Braxton said that around the time of the murder Petitioner had asked him for some .380 rounds. (Ex. Rta2 at 5, Dkt. No. 8-32.) Braxton also said he had recently seen Petitioner operating a drug set at 559 Pine Street in Camden, in possession of a gun. (Id. at 6.) Based on evidence of the victim's autopsy, a .380 caliber bullet was extracted from the victim's head. (Id. at 12.) Other witnesses gave statements about engaging in drug transactions with Petitioner which were relevant and important background to understand the State's case. (Id. at 12-28.)

Braxton's testimony about the ammunition and Petitioner's possession of a gun were close in time and location to the murder of the victim, therefore, the evidence had probative value. Further, Petitioner's operation of a drug set was relevant to the context of the murder because the alleged motive was theft of a

drug dealer's stash. With a proper limiting instruction, the evidence of Petitioner's drug dealing was not so prejudicial as to infect the entire trial with unfairness.

The trial court gave the following jury instructions:

> Further, if I gave you a limiting instruction on how to use certain evidence, that evidence must be considered by you for that purpose only. You can't use it for any other purpose. I'm going to give you some limiting instructions that I gave you during the testimony. I told you, for example, that there was some testimony that the defendant was involved in running a drug set, selling drugs. And I said, well you can't use that to prove that he did this bad stuff before, so he must have committed this crime. You can't use it for that purpose.
>
> You can only use it, for example, to prove motive and identification. And I'll talk to you about that. That's just an example of limiting instructions. So, I'll tell you again some of those areas where I said you can only use it for those particular purposes.

(Ex. Rta12 at 119-120, Dkt. No. 8-42.) The trial court also instructed:

> Now I told you in the beginning when I said "Here is an example of a limiting instruction", remember I said you can't use prior – –, or, maybe you might consider bad acts as evidence that the defendant was involved in this particular incident, you can only use it for certain purposes.
>
> I said there is testimony that the defendant is involved in a drug set and I said to you, you can't use that to prove that because he did that that he was involved in this crime. I said the only way – – the only reason would be for motive and identification.

This is another limiting instruction. The State introduced evidence that the defendant was involved in drug distribution activity and also by virtue of I think Ernest Braxton's testimony that the defendant also allegedly had a .380 gun before the date of the alleged incident.

Now, normally such evidence is not permitted under our Rules of Evidence. Our rules specifically exclude evidence that a defendant had committed other wrongs or acts when it's offered only to show that he had a disposition or tendency to do wrong and therefore must be guilty of the charges offenses.

Now, before you can give any weight to this evidence you must be satisfied that the defendant committed the other wrongs or acts. And if you are not satisfied, you may not consider it for any purpose.

However, our rules do permit evidence of other wrongs or acts when the evidence is used for certain specific narrow purposes. Like I told you, in this case the State offered the evidence with respect to the drug distribution activity as a motive for the shooting of Anthony Ball and also for identification purposes of the defendant as the alleged perpetrator.

Also, the testimony that the defendant allegedly had a .380 gun before the date of the alleged offense can only be used by the State to prove identity and opportunity and for no other purpose whatsoever.

Now, whether the evidence does, in fact, demonstrate motive or identification or opportunity is for you, the jury to decide. You may decide the evidence does not demonstrate, motive, identity or opportunity and is not helpful to you at all. In that case, you must disregard the evidence.

On the other hand, you may decide that the
evidence does demonstrate motive and/or
identity and/or opportunity and you can use it
for that specific purpose only. However, you
may not use this evidence to decide that the
defendant has a tendency to commit crimes or
that's a bad person.

That is, you may not decide that just because
the defendant committed other wrongs or acts
that he must be guilty of the present crimes.

I have admitted the evidence only to help you
decide the specific questions of motive and/or
identification and/or opportunity. You  may
not consider it for any other purpose and may
not find the defendant guilty now simply
because the State has offered testimony that
the defendant committed other wrongs or acts.

(Rta12 at 142-45, Dkt. No. 8-42.)

A jury is presumed to have followed the instructions given.

Weeks v. Angelone, 528 U.S. 225, 234 (2000). Here, the evidence

was probative of motive, opportunity and identification, the jury

was instructed it was up to them to decide whether the evidence

demonstrated motive, opportunity or identification, and the jury

instructions were clear that the evidence could not be used to

infer Petitioner was a bad person or had a tendency to commit

crimes. Therefore, habeas relief is denied on ground seven because

not every fairminded jurist would disagree with the Appellate

Division's denial of this claim. See Alford v. Warden New Jersey

State Prison, No. CV 15-5640 (JBS), 2019 WL 1418121, at *6 (D.N.J.

Mar. 29, 2019) ("Other crimes evidence is routinely admitted when

it is relevant to show 'identity.'") (citing Bronshtein v. Horn,

68

404 F.3d 700, 731 (3d Cir. 2005) (citing Fed. R. Evid. 404(b); United States v. Wilson, 31 F.3d 510, 515 (7th Cir. 1994) (permitting evidence of prior drug transactions in order to establish a "buyer-seller relationship" between informant and defendant, identification of defendant, and to show how informant met defendant); United States v. O'Leary, 739 F.2d 135, 136 (3d Cir. 1984) (agreeing the need "to show the background of the charges [and] the parties' familiarity with one another" were purposes under Rule 404(b) (quotation marks omitted)).

I.   Ground Eight

In his eighth ground for relief, Petitioner contends that defense counsel was ineffective for failing to meaningfully investigate the case, failing to present alibi and rebuttal witnesses for the defense, and failing object to inconsistent evidence of motive for the crime. (Pet. at 40-42, Dkt. No. 1.) Petitioner claims that before trial he provided his trial counsel with numerous affidavits from prospective defense witnesses, many of whom were alibi witnesses and were not called to testify. These affidavits and descriptions of prospective defense witnesses were included in Petitioner's PCR Brief. (See Ex. Ra15b [unnumbered], Dkt. No. 8-18 at 31-73.) In his traverse, Petitioner submits that "[d]ue to ineffective assistance of counsel, the States [sic] succeeded presenting the jury with two equally unreasonable and mutually inconsistent theories of motive while his alibi witness

defense for the jury went unanswered." (Traverse at 36, Dkt. No. 9 at 41.) Petitioner seeks an evidentiary hearing on ineffective assistance of counsel. (Id. at 37, Dkt. No. 9 at 42.)

1.    *Ineffective assistance of counsel standard of law*

Strickland v. Washington governs ineffective assistance of counsel claims on habeas review. See Harrington v. Richter, 562 U.S. 86, 101 (2011) ("The pivotal question [on habeas review] is whether the state court's application of the *Strickland* standard was unreasonable.") There are two elements to a Sixth Amendment ineffective assistance of counsel claim, deficient performance by counsel and prejudice. Strickland v. Washington, 466 U.S. 668, 691-92 (1984). "[T]here is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one." Id. "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." Premo v. Moore, 562 U.S. 115, 121 (2011).

For the deficient performance prong, "a person challenging a conviction must show that counsel's representation fell below an objective standard of reasonableness." Id. (internal quotations omitted) (quoting Richter, 562 U.S. at 104). A petitioner must overcome a "'strong presumption' that counsel's representation was

within the 'wide range' of reasonable professional assistance." _Id._ (quoting _Richter_, 562 U.S. at 104) (quoting _Strickland_, 466 U.S. 668, 689 (1984)).

The burden a petitioner must meet is "'that counsel made errors so serious that counsel was not functioning as the counsel guaranteed the defendant by the Sixth Amendment.'" _Premo_, 562 U.S. at 122 (quoting _Richter_, 562 U.S. at 104) (quoting _Strickland_, 466 U.S. at 687)). "Reliance on 'the harsh light of hindsight' … is precisely what _Strickland_ and AEDPA seek to prevent." _Richter_, 562 U.S. at 107 (quoting _Bell v. Cone_, 535 U.S. 685, 702 (2002)). Habeas review of counsel's performance is doubly deferential, and the question is not whether counsel's actions were reasonable but whether there is any reasonable argument that counsel satisfied _Strickland_'s deferential standard. _Id._ at 105 (citations omitted).

### 2. _Failure to meaningfully investigate case and present alibi and rebuttal witnesses_

Petitioner contends that he provided his counsel with numerous affidavits from prospective defense witnesses in 2008 and 2009, and although many of these witnesses "would have placed the petitioner in their presence at the time the victim was shot," defense counsel never considered or used these witnesses. (Pet. at 40, Dkt. No. 1.) Respondents argue that the PCR court properly found that Petitioner's ineffective assistance of counsel claims failed under both prongs. (Answer at 109, Dkt. No. 9.)

a. _State court determination_

The Appellate Division, upon review of the PCR court's decision, after discussing the Strickland standard governing ineffective assistance of counsel claims, addressed Petitioner's claim concerning counsel's failure to call certain witnesses.

> Defendant argues the PCR court should have granted him an evidentiary hearing to address his claim that his trial counsel was ineffective for failing to produce five witnesses to offer alibi testimony on his behalf. We disagree.
>
> . . .
>
> Defendant submitted no objective evidence to support his argument that his trial counsel was ineffective for not having adduced the testimony of witnesses he claims would have provided exculpatory testimony. As Judge Delaney noted, the affidavits presented by defendant all predated the trial and defendant's counsel was aware of the affiants because he provided the same affidavits in a letter to the prosecutor before trial. Judge Delaney reviewed each affidavit and explained with particularity why each did not justify an evidentiary hearing.
>
> Defendant presented the pre-trial affidavits of Alexander, Burgos, and Colvin, which purported to establish an alibi defense. After reviewing the affidavits, Judge Delaney concluded placing those witnesses on the "stand would have provided minimal, if any, favorable testimony and posed great risk of damaging testimony on cross-examination." This was because Burgos' affidavit placed defendant at the scene of the murder at the same time it took place and Alexander's affidavit provided no credible alibi.

Although Judge Delaney did not expressly utter Colvin's name when she stated "The remaining Affidavits were equally insufficient to establish a credible defense[,]" it is obvious from Colvin's pre-trial affidavit that she was "getting high," heard the gunshot and did not observe the shooter. Thus, her testimony would not establish a credible defense.

Howe's pre-trial affidavit purportedly named another person as the shooter. However, Judge Delaney found calling Howe as a witness would have damaged her credibility because the affidavit contradicted her statement to the police.

Defendant's PCR counsel produced an investigator's report indicating Montgomery stated defendant was inside the residence from which he was dealing drugs during the shooting. However, as the State points out in its brief, no affidavit from Montgomery was provided and she later refused to sign one.

Also, as the State has argued, the record demonstrates defendant acknowledged the trial strategy not to call any of the witnesses he now asserts were crucial to his defense. Indeed, the trial judge took special care to address this issue during the trial.

COURT: [Y]ou heard the representations of your counsel with respect to, first of all, not calling witnesses except for Mr. Ellis bringing in some photographs. Do you understand that decision on his part?

DEFENDANT: Yes.

COURT: I can't ask you about the discussions that took place because it's subject to the attorney/client privilege, but I understand that you do know that it's [a] strategic decision?

DEFENDANT: Yes.

> Therefore, Judge Delaney properly concluded
> [d]efendant has submitted no [a]ffidavits or
> [c]ertifications supporting his alleged alibi
> defense and consequently cannot show that
> counsel was ineffective for failing to further
> investigate or call these witnesses at trial.
>
> . . .
>
> This court is convinced . . . defendant knew
> that counsel was aware of the [a]ffidavits and
> discussed this trial strategy with counsel.…
> Even if counsel presented these witnesses at
> trial there's no reasonable probability that
> the outcome would have been different….
>
> In sum, . . . defendant has not demonstrated
> a prima facie claim that counsel was
> ineffective for failing to investigate and
> present witnesses who provided incredible
> pretrial [a]ffidavits.
>
> Defendant's PCR petition failed to demonstrate
> actual ineffectiveness of counsel or a
> reasonable probability the outcome would have
> been different had trial counsel called these
> witnesses to testify. Judge Delaney correctly
> found defendant did not present a prima facie
> case of ineffective assistance of counsel and
> that an evidentiary hearing was not required.

(Ra22 at 5-11, Dkt. No. 8-26 (footnotes omitted.)

b. *Analysis*

The Appellate Division adjudicated this claim under
Strickland, the appropriate Supreme Court precedent. As found by
the Appellate Division, it is significant that defense counsel was
aware of these witnesses before trial because it supports the
conclusion that counsel made a strategic decision not to call the
witnesses. See e.g., Gilreath v. Bartkowski, No. CIV.A. 11-5228

MAS, 2014 WL 4897053, at *11 (D.N.J. Sept. 30, 2014) (counsel was not ineffective by making strategic decision not to call high risk alibi witness). At trial, the defense presented only one witness and the trial judge asked Petitioner if he understood counsel's strategic decision not to call additional witnesses, and Petitioner answered yes. (Ex. Rta12 at 3-4, Dkt. No. 8-42). The Appellate Division reviewed the PCR court's discussion of the proposed alibi witnesses and reasonably found their testimony would not have provided an alibi and may have further harmed the defense.

Importantly, the PCR Court found,

> [i]t is clear to this court that counsel was aware of the affiants because counsel addressed a letter to the prosecutor on May 25, 2010 with which he included the very same Affidavits of Malika Colgan, Michele Howell and Frank Alexander. It is also clear to this court that the ages of the Affidavits together with the letter from counsel indicate that he was not only aware of the affiants and their allegations but that counsel considered them during his preparation for trial. … Furthermore, the fact that counsel ultimately decided not to call them as witnesses is not evidence of deficient performance, but instead demonstrates the minimal value of presenting these witnesses and exposing them to cross-examination by the prosecutor.

(Ex. Rta15 at 33-34, Dkt. No. 8-46 at 17-18.)

On habeas review, this Court must provide "double deference" to the state court's disposition of ineffective assistance of trial claims. Davis v. Adm'r New Jersey State Prison, 795 F. App'x 100,

102 (3d Cir. 2019), <u>cert.</u> <u>denied</u> <u>sub</u> <u>nom.</u> <u>Davis v. Johnson</u>, 140 S. Ct. 2748, 206 L. Ed. 2d 923 (2020) (citing <u>Knowles v. Mirzayance,</u> 556 U.S. 111, 123 (2009)). Petitioner has not crossed the high threshold to establish that the Appellate Division's denial of his ineffective assistance of counsel claim based on the failure to conduct a meaningful investigation and present alibi witnesses involved an unreasonable application of <u>Strickland</u>. <u>See</u> <u>Lewis v.</u> <u>Horn</u>, 581 F.3d 92, 108 (3d Cir. 2009) (even if counsel's investigation and presentation of alibi defense was deficient, the strength of the evidence of guilt precluded reasonable probability that outcome of trial would have been different).

      3. *Failure to object to inconsistent motive testimony*

Petitioner's second ineffective assistance of counsel claim is that his counsel failed to object to inconsistent testimony regarding motive. (Pet. at 40-42, Dkt. No. 1.) Angela Bumpers and Patricia Myers testified that Petitioner's motive was either an immediate provoked response to the victim's theft of Petitioner's stash or Petitioner was motivated by a past dispute over money. Petitioner contends it is impossible to determine the mental state necessary for murder because if the jury found the shooting was an immediate provoked response to theft, it constituted only manslaughter. Respondents counter that the state courts' rejection of Petitioner's ineffective assistance of counsel claims involved

a reasonable determination of the facts and reasonable application

of the Strickland standard. (Answer at 116, Dkt. No. 8.)

    a. *State court determination*

The Appellate Division did not address the merits of this

claim on PCR appeal. This Court will, therefore, look through to

the PCR Court's reasons for denying the ineffective assistance of

counsel claim. Wilson, 138 S. Ct. at 1192.

> The defendant fails to show that defense
> counsel was ineffective for failing to object
> to allegedly inconsistent evidence underlying
> the motive for the crime. The defendant argues
> that counsel was ineffective for failing to
> object to allegedly mutually inconsistent
> evidence of the State's theory of motive.
> Specifically, defendant argues that the State
> presented evidence that the defendant murdered
> the victim both because the victim attempted
> to steal his drugs and because the victim owed
> him money. The defendant argues that these
> alleged mutually exclusive theories required
> the jury to guess and could have resulted in
> depriving defendant of his life and liberty.
> Notably, however, the State was not required
> to prove motive since it is not an essential
> element for a conviction of first degree
> murder. As stated in *State vs. Beer*, 22 16
> N.J. 50, a 1954 New Jersey Supreme Court case.
> The only essential elements of murder are (1)
> that the defendant caused the victim's death
> or serious bodily injury that resulted in the
> victim's death and (2) that the defendant did
> so purposely and knowingly. And I cite New
> Jersey Statute 11:3A(1) and (2).
>
> Moreover, jurors need not always be unanimous
> on the theory of guilt provided they are
> unanimous on the finding of guilt on the
> offense charged. And I cite *State vs. Harris*,
> 141 N.J. 525, citing *State vs. Parker*, 124
> N.J. 628.

Here, whether the jury believed the defendant killed the victim because he stole his stash or because he owed him money, the State presented sufficient evidence to prove beyond a reasonable doubt that the defendant murdered the victim. The evidence at trial showed beyond a reasonable doubt that the defendant purposely or knowingly caused the death of the victim no matter what his motive may have been. He was convincingly identified as the shooter by multiple eyewitnesses who knew him personally through their drug transactions with him.

Moreover, the ballistics and forensics evidence corroborated the witness testimony that this was an execution style murder from mere point blank range. Accordingly, whether the defendant ultimately pulled the trigger because he was unhappy with the victim for taking the defendant's stash or for not paying his debt, the State nevertheless proved beyond a reasonable doubt each of the essential elements of first degree murder. Therefore, the defendant can not show that counsel was ineffective for failing to object to the State's alleged mutually and consistent theories of motive.

Moreover, there was no evidence at trial sufficient to establish that the defendant was provoked and he killed in the heat of passion. The defendant argues that the State's theory of motive created a question of passion provocation which could have affected the degree of guilt and that counsel was ineffective for failing to address this issue at trial. Here, the defendant argues that his rage at the victim's attempt to steal his drugs amounted to adequate provocation and the subsequent killing was in the heat of passion.

However, it is not objectively reasonable to lose self control and take a person's life because the person stole one's drugs. That reaction is patently unreasonable and is not

sufficient to merit a passion provocation charge. There was no evidence presented that the victim attacked the defendant, threatened him, or did anything to reasonably provoke a murderous rage. Consequently, there was no provocation adequate to merit a passion provocation charge that could have altered the defendant's degree of guilt. Accordingly, counsel was not ineffective for failing to object to the State's presentation of its theory of motive.

Defendant cannot establish a prima facie claim of ineffective assistance of counsel for counsel's failure to object to allegedly inconsistent evidence underlying the motive for the murder.

(Ex. Rta16 at 37-40, Dkt. No. 8-46 at 19-21.)

b. *Analysis*

The state court denied this claim on the merits. Review of the claim, therefore, is limited to the state court records and Petitioner's request for an evidentiary hearing is denied. Pinholster, 563 U.S. at 180-81 (2011). The PCR court found motive was not an essential element of the murder charge, therefore, counsel was not ineffective for failing to object to inconsistent testimony regarding motive. See State v. Cherry, 674 A.2d 589, 602 (N.J. Super. Ct. App. Div. 1995) (citing State v. Beard, 16 N.J. 50, 60-61, 106 A.2d 265 (1954) (under New Jersey law, motive is not an essential element of murder). Whether Petitioner was provoked by the immediate theft of his drug stash or his motive was an earlier dispute over money is immaterial because neither case presents an objectively reasonable provocation for murder

that required the jury to consider manslaughter. State v. Ortiz, No. A-3952-18, 2021 WL 753554, at *5 (N.J. Super. Ct. App. Div. Feb. 26, 2021) ("The element of adequate provocation is measured by whether "loss of self-control is a reasonable reaction.") (citing State v. Foglia, 415 N.J. Super. 106, 126 (App. Div. 2010) (quoting State v. Mauricio, 117 N.J. 402, 412 (N.J. 1990)). Therefore, the PCR court reasonably applied the Strickland standard in finding counsel was not ineffective for failing to object to inconsistent motive testimony. For all of these reasons, the Court denies ground eight of the petition.

IV.  CERTFICATE OF APPEALABILITY

Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken from a final order in a proceeding under 28 U.S.C. § 2254. 28 U.S.C. § 2253(c)(1). A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." Miller-El v. Cockrell, 537 U.S. 322, 327 (2003). For the reasons discussed above, Petitioner has not made a substantial showing of the denial

of a constitutional right. Therefore, the Court will deny a certificate of appealability.

V.   CONCLUSION

Petitioner has not established his burden on habeas review to show the state courts' denial of his claims was contrary to or involved an unreasonable application of clearly established federal law, nor did Petitioner overcome the presumption of correctness of a state court factual finding and establish that a state court decision was based on an unreasonable determination of the facts in light of the evidence presented. Therefore, the Court denies the habeas petition.

An appropriate Order follows.

Date:  May 4, 2021

s/Renée Marie Bumb
**RENÉE MARIE BUMB**
**United States District Judge**
